No. 14610

IN THE SUPREME COURT OF THE STATE OF MONTANA

1979

———————————

IN THE MATTER OF THE GUARDIANSHIP
OF RONALD ASCHENBRENNER, TERRI
LYNN ASCHENBRENNER, and JASON
JACOB ASCHENBRENNER, Minors.

———————————

Appeal from:   District Court of the Second Judicial District,
               Honorable Arnold Olsen, Judge presiding.

Counsel of Record:

        For Appellants:

            Lewis Rotering argued, Butte, Montana

        For Respondent:

            Leonard J. Haxby argued, Butte, Montana

———————————

                              Submitted:   June 11, 1979

                              Decided: JUL 17 1979

Filed: JUL 17 1979

*Thomas J. Kearney*
                    Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

Mary Aschenbrenner, natural mother of Ronald, Terri Lynn, and Jason Jacob Aschenbrenner, appeals from the findings, conclusions and order of the District Court, Silver Bow County, granting letters of guardianship and custody of the three minor children to A. B. (Bud) and L. V. (Lillian) Aschenbrenner, the paternal grandparents.

The facts leading to this appeal are:

On December 27, 1976, Mary Aschenbrenner by the terms of a divorce decree was awarded the care, custody, and control of her three minor children, at that time aged eight, four, and one and a half years old.

Following the divorce, the mother lived alone with the children until the middle of May 1977, when she began living with one Jay McClosky. Her relationship with McClosky was stormy and following one particular incident, the mother asked the grandparents to care for the children while Mary found another place for herself and the children to live. The grandparents had custody of the children from May 19 until June 9, 1977, when Mary resumed custody. Part of this three-week period apparently coincided with her ex-husband's annual two-week summer visitation period during which he sometimes left the children with his parents while he was out working on the road.

Following another incident with McClosky, Mary again requested the grandparents to care for the children on June 30, 1977. The whole family, including Mary, her ex-husband, the children, and the grandparents, vacationed together over the Fourth of July weekend. When the mother attempted to obtain the return of the children the following week, however, she was denied. When she tried to enlist the assis-

tance of the county attorney, she was served with a citation and order to show cause on July 21, 1977. The order to show cause, dated July 21, 1977, and issued in response to a petition for appointment of guardian of minors filed by the grandparents on June 15, contained a provision awarding temporary custody of the children to the grandparents.

Subsequent to the issuance of this order to show cause, several hearings over several months were held by the District Court. At these later hearings, the District Court heard testimony from the parties and from Roger LaVoie, a county social worker. The court kept in effect its grant of temporary custody, modifying it at times to allow the mother reasonable visitation rights to her children on weekends. During the course of the proceedings, the relationship between the mother and the grandparents, especially the grandfather, was strained. The grandfather seemed to embark on a course of interfering with or hindering Mary's attempts to talk to the children on the phone or otherwise visit with them.

As to the children's well-being, the court questioned them in chambers. They seemed to express no strong preference for living with either their mother or grandparents. According to the social worker's report, however, the school work and attitude of the eldest child had markedly improved, the middle child had a positive attitude toward school and all three children seemed to be better cared for by the grandparents. Although during his testimony the social worker declined to label Mary an "unfit" parent, he did classify her as "deficient" in some respects in her ability as a parent. This classification was based on her tendency to "party" excessively, leaving the children alone, on her

inability to make sure the children attended school, and on her generally unsettled emotional status and living arrangements. It was his recommendation that the children remain in the custody of the grandparents.

After maintaining the temporary custody status for over a year, the District Court, on August 14, 1978, issued its findings and conclusions. Significant among its findings were that there had been a material change in the circumstances of the mother since the entry of the divorce decree; that she had not had adequate, permanent housing; and had not conducted herself as a fit and proper mother by continually going out and leaving the children alone and unattended. The District Court also found that while in his mother's care, the eldest child's schoolwork suffered materially but improved while in the care of his grandparents. The court found that the mother was not a fit and proper person to have custody of the children by virtue of her irresponsible behavior and concluded that the children were dependent and neglected.

Based on these findings, the court ordered that the grandparents be granted guardianship of the children with reasonable rights of visitation in the mother, including custody of the children during June and July. From this order, the mother appeals.

The issues presented for review on appeal are:

1. Whether the appellant was denied procedural due process by the District Court's award of a temporary custody order without prior notice and opportunity for a hearing?

2. Whether a guardianship proceeding may be used to terminate the custodial rights of a natural parent?

3. Whether the District Court abused its discretion in awarding the guardianship and custody of the children to the respondents?

The right of a parent to custody of his child has been recognized by this Court as being a fundamental constitutional right. Matter of Guardianship of Doney (1977), ____ Mont. ____, 570 P.2d 575, 577, 34 St.Rep. 1107, 1110. In view of this, we must, look closely at any action by the State which interferes with this right. Our examination of the procedure utilized in the District Court in this case leads us to conclude that the termination of the mother's custody and the award of guardianship to the grandparents was improper and must be reversed.

The grandparents instituted this action by filing a petition for appointment of guardian of minors. We thus begin our analysis by examining the statutes governing the appointment of such guardians. Part 2, Chapter 5, Title 91A, 1947 Revised Codes of Montana, now Part 2, Chapter 5, Title 72 Montana Code Annotated.

Initially, we note that under section 91A-5-204, R.C.M. 1947, now section 72-5-222(1) MCA, that a "court may appoint a guardian for an unmarried minor if all parental rights of custody have been terminated or suspended by circumstances or prior court order." The District Court is required, however, to following very specific procedures in the appointment of the guardian:

> "(1) Notice of the time and place of hearing of a petition for the appointment of a guardian of a minor is to be given by the petitioner in the manner prescribed by section 91A-1-401 to:
>
> "(a) the minor, if he is fourteen (14) or more years of age;

-5-

"(b) the person who has had the principal care and custody of the minor during the sixty (60) days preceding the date of the petition; and

"(c) any living parent of the minor.

"(2) Upon hearing, if the court finds that a qualified person seeks appointment, venue is proper, the required notices have been given, the requirements of section 91A-5-204 have been met, and the welfare and best interests of the minor will be served by the requested appointment, it shall make the appointment. In other cases the court may dismiss the proceedings, or make any other disposition of the matter that will best serve the interest of the minor." Section 91A-5-207, R.C.M. 1947, now section 72-5-225 MCA.

Under section 91A-5-207(3), R.C.M. 1947, now section 72-5-224 MCA, the court is authorized "if necessary, [to] appoint a temporary guardian with the status of an ordinary guardian of a minor, but the authority of a temporary guardian shall not last longer than 6 months."

With these principles in mind, we examine the sequence of events in the District Court. As noted above, before any guardian may be appointed for a minor, all parental rights of custody must be terminated or suspended by circumstances or prior court order. Both parties concede that there was no prior court order terminating or suspending the mother's parental right of custody. To the contrary, only six months prior to the institution of this action, the mother was awarded custody of these children following her divorce.

It thus becomes necessary to determine whether the mother's parental rights of custody were "suspended by circumstances" in the language of section 75-5-222(1) MCA. To so determine, we examine with particularity the following sequence of events:

May 19, 1977 -- The mother, after a fight with her paramour, leaves the children with the grandparents while she looks for another place to live. This period of time coincides with her ex-husband's

-6-

annual two-week visitation period during which he often left the children with his parents, the petitioners.

June 9, 1977 -- The mother resumes custody of the children.

June 15, 1977 -- The grandparents file their petition for appointment of guardian of minors. This petition stated, apparently inaccurately, that the children were presently in the care and custody of their paternal grandparents and had been in their custody since about May 18.

June 20, 1977 -- The District Court, based exclusively on the grandparents' petition and affording neither notice nor hearing to the mother, awards temporary custody of the children to the grandparents and sets July 30 as the hearing date on whether the grandparents should be awarded permanent custody.

June 30, 1977 -- The mother again leaves the children with the grandparents.

July 2, 3, 4, 1977 -- The entire family, including the mother, her ex-husband, the children, and the grandparents, vacation together at Canyon Ferry Lake. Although by this time the grandparents had been awarded temporary custody of the children, they neither discussed nor even mentioned this fact to the mother during this family vacation.

July 21, 1977 -- The mother seeks assistance from the County Attorney in attempting to regain custody of the children, after the grandparents have refused to return them. At this time, the mother first receives notice of the order granting temporary custody of the children to the grandparents.

From this sequence of events, it is obvious that the mother's parental rights of custody had not been terminated by circumstances. In fact, contrary to the allegations in the petition for guardianship, the mother had actual physical custody of the children at the time the petition was filed by the grandparents and the order was issued by the District Court.

Moreover, at the time the District Court issued its order granting temporary custody of the children to the grandparents, on June 17, all that had happened to indicate that the mother had somehow abandoned or given up her parental

rights of custody was that she had left the children with the grandparents for a period of three weeks while she looked for another place to live. In Matter of Guardianship of Doney (1977), ____ Mont. ____, 570 P.2d 575, 34 St.Rep. 1107, the natural father of the children left them with his sister-in-law for a period of two months "while he composed himself and prepared to take the children into his home" and thereafter even signed guardianship papers, giving his consent to give temporary custody of the children to his sister-in-law. In rejecting the argument that this showed an abandonment of parental custodial rights, we stated: "Surrender of custody of a minor child by a parent is presumed to be temporary unless the contrary is made to appear." Doney, 570 P.2d at 577.

Quite simply, at the time of issuing its order granting temporary custody to the grandparents, the District Court had no evidence that the mother's parental rights of custody had been suspended or terminated by either prior court order or circumstance. The requirements of section 91A-5-204 have not been met and therefore any order purporting to appoint a guardian is invalid.

Beyond the jurisdictional question of the termination of the mother's parental rights of custody, there are procedural errors which likewise require reversal. As noted above, prior to appointing a guardian for a minor, there must be notice given to, among others, any living parent of the child. Thereafter, there must be a hearing at which the District Court is required to determine, inter alia, that the required notices were given and that all parental rights of custody have been terminated.

The District Court's order, though couched in terms of temporary custody, was issued in response to a petition for appointment of guardian of minors and was, in effect, the appointment of a temporary guardian. Yet, there was no notice to the mother, no hearing prior to the appointment of the temporary guardian, no determination that the required notices had been given, and no determination that the mother's parental rights of custody had been terminated or suspended.

"The court's granting temporary custody to the [grand-parents] without notice to the mother was error." Henderson v. Henderson (1977), ___ Mont. _____, 568 P.2d 177, 179, 34 St.Rep. 942, 944. Nor was this error corrected by the fact that the mother participated in a hearing on the petition later. As we stated in Henderson:

> ". . . Regardless of any deficiency in obtaining temporary custody, the aunt argues the issue is moot since a full hearing on the merits of the petition for permanent custody was held on July 6, 1976. We disagree. The transcript on appeal indicates the district judge conducting the hearing on permanent custody mistakenly assumed that another district judge had conducted a hearing and found misconduct on the part of the mother before he awarded temporary custody of the children to the aunt. This temporary custody order in effect created a presumption in favor of the aunt and shifted the burden of proof to the mother, and was in direct violation of section 48-333(1), R.C.M. 1947." 568 P.2d at 180.

In the instant case, the District Court was led to believe by the petition filed by the grandparents that the mother had abandoned the children to the grandparents on May 18, 1977, and had not returned for them by June 15 when the petition was filed. This was incorrect. As testified to at the hearing by the grandmother, the mother had returned for her children on June 9, 1977, a full week before the petition was filed. Indeed, it appears the mother had actual

physical custody of the children on the day the petition was filed and on the day the order was issued. From the date of the issuance of this order, however, the mother labored under an unfair, inaccurate prejudicial presumption that she had abandoned her children. This presumption necessarily colored the subsequent proceedings to the point that any final order or judgment based thereon must be reversed.

Finally, any showing that the grandparents may be able to prove a "better" environment than can the mother is irrelevant to this issue of custody as between the mother and the grandparents, especially in view of the above-mentioned fundamental constitutional right of a parent to custody of her children. As we stated in Doney:

> ". . . This 'best interests of the child' test, however, is used only after a showing of dependency or abuse or neglect by the natural parent, as defined in section 10-1301, R.C.M. 1947, or in custody disputes between two natural parents. . . . Without the required statutory showing that petitioner had abused or neglected his children, the district court under the facts of this case had no jurisdiction to deprive the natural father of their custody. The state is entirely powerless to deprive a natural parent of the custody of his minor children merely because a district judge or a state agency might feel that a nonparent has more financial resources or pursues a 'preferable' lifestyle." 570 P.2d at 578. (Citations omitted.)

And in Henderson:

> "The 'best interest of the child' test is correctly used to determine custody rights between natural parents in divorce proceedings. In this situation the 'equal rights' to custody which both the father and mother possess under section 61-105, R.C.M. 1947, are weighed in relation to each parent's ability to provide best for the child's physical, mental, and emotional needs upon the breakdown of the marital relationship. 'Fitness' of each parent is determined only in relation to the other and not to society as a whole. However, where third parties seek custody, it has long been the law in Montana that the right of the natural parent prevails until a showing of a forfeiture of this right. Ex parte Bourquin, 88 Mont. 118, 290 P. 250 (1930). See

also Matter of Fisher, 169 Mont. 254, 545 P.2d
654, 33 St.Rep. 183 (1976). The Uniform Marriage
and Divorce Act does not change this law. This
forfeiture can result only where the parent's
conduct does not meet the minimum standards of
the child abuse, neglect and dependency statutes."
568 P.2d at 181-82. (Emphasis added.)

In the instant case, the District Court heard only one person testify that the mother was "unfit" to care for her children, the grandfather. The investigating social worker specifically declined to call the mother "unfit." When the grandmother was asked her opinion, of the mother's care of the children from the divorce until July 4, 1977, she replied:

"A. I don't know when I'm not there, but I've
told you when I've had them. What she does when
she has them, I don't know. I always thought she
was a pretty good mother when she had the children.
I don't know."

The District Court also conducted an in camera examination of the three children during which the following exchange between the court and the eldest child occurred:

"THE COURT: You lived with your mother in June
and July?

"RONALD: (Witness nods affirmatively.)

"THE COURT: How did you get along?

"RONALD: Not too good. A bunch of fighting always.

"THE COURT: What were you fighting about?

"RONALD: I don't know. This one kid, he caused
a fight down there.

"THE COURT: Down on Park Street?

"RONALD: Yeah.

"THE COURT: You got along good with your mother,
didn't you?

"RONALD: (Witness nods affirmatively.)

"THE COURT: You get along with your grandmother
and grandfather?

"RONALD: Yes."

In addition to the above specific examples, the transcript is replete with demonstration by the mother of her continuing concern and care for her children. In fact, at one point, the grandfather threatened to change his phone number because the mother was calling the children so often. Throughout the proceedings, the mother has opposed the attempt by the grandparents to obtain permanent custody of the children.

Clearly, from this evidence, the District Court was not warranted in concluding that the mother was not fit to care for her children. Such evidence must be clear and convincing to justify depriving a parent of custody of her children. Matter of J.L.B. (1979), _____ Mont. _____, _____ P.2d _____, 36 St.Rep. 896, 909. The fact that the grandparents may be able to provide a better home is exactly the kind of rationale condemned in Doney.

The District Court concluded that the children were "dependent and neglected under the laws of the State of Montana." Yet, this was a guardianship proceeding instituted by the paternal grandparents, not a proceeding instituted to have the children declared dependent and neglected, as it must be, by the county attorney under Title 10, Chapter 13, 1947 Revised Codes of Montana, now Title 41, Chapter 3, Montana Code Annotated. The District Court could not validly conclude that the children were dependent and neglected.

Similarly, the District Court found the mother to be not a fit and proper person to have custody of her children and terminated her custody rights. As pointed out above, however, the termination of all parental rights must precede the appointment of a guardian for unmarried minors. Section 91A-5-204, and -207, R.C.M. 1947, now sections 72-5-222,

and -225 MCA. Nowhere in the record does anything appear concerning the termination of the parental rights of the father of these children. In any event, a guardianship proceeding is not a proper means to terminate a parent's constitutional right to custody of his or her children. As we stated in Doney:

> ". . . A judicial hearing and finding of dependency and neglect under Title 10, Chapter 13, R.C.M. 1947, or judicial finding of willful abandonment or willful nonsupport under section 61-205, R.C.M. 1947, are the exclusive means by which a natural parent may be involuntarily deprived of custody of his children. In the absence of such showing, the natural parent is legally entitled to the custody of his minor children. Section 61-105, R.C.M. 1947." 570 P.2d at 577.

As a last example, the application of the statutory guardianship procedure was incorrect. Under these procedures, a District Court may, if necessary, appoint a temporary guardian of unmarried minors but the authority of the temporary guardian cannot last longer than six months. In the instant proceedings, however, the original order granting temporary custody of the children to the grandparents was entered in June 1977. This temporary custody status was continued by the District Court until August 1978, a total of fourteen months before permanent letters of guardianship were issued by the District Court.

The confusion in the District Court is understandable. We are able to identify at least five distinct statutory schemes governing the termination of parental rights or the custody of children or both. Title 10, Chapter 13, R.C.M. 1947, now Title 41, Chapter 3 MCA (abused, neglected and dependent youth); Title 48, Chapter 3, R.C.M. 1947, now Title 40, Chapter 4 MCA (Uniform Marriage and Divorce Act); sections 61-111, -112, R.C.M. 1947, now sections 40-6-233,

and -234 MCA (remedy for parental abuse); Title 61, Chapter 2, R.C.M. 1947, now Title 40, Chapter 8 MCA; Title 91A, Chapter 5, Part 2, R.C.M. 1947, now Title 72, Chapter 5, Part 2 (Guardianship of Minors).

Nevertheless, while there is some overlap in these various procedures as to general subject matter, each is used for a distinct purpose and sets forth specific procedures which must be followed before a valid judgment or order may be issued. To insure that the minors involved receive the full protection of these laws, these procedures should be "rigorously followed." In re Guardianship of Evans (1978), ____ Mont. ____, 587 P.2d 372, 376, 35 St.Rep. 1768, 1773. District Courts must identify and adhere to the proper procedure and standards to be used in the proceedings before them. Only then will the fundamental rights and relationship existing between parent and child be fully realized or, when necessary, properly severed.

The order of the District Court granting letters of guardianship to the grandparents is reversed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

-14-