No. 95-404

IN THE SUPREME COURT OF THE STATE OF MONTANA

1996

IN RE GUARDIANSHIP OF D.T.N.,

a Minor Child.

FILED

APR 0 5 1996

*Ed Smith*

CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   District Court of the Twenty-First Judicial
               District, In and for the County of Ravalli,
               The Honorable Jeffrey H. Langton, Judge presiding.


COUNSEL OF RECORD:

        For Appellant:

            Mary Rose Heller, Sanders & Heller,
            Hamilton, Montana

        For Respondent:

            Judith A. Loring, Attorney at Law,
            Stevensville, Montana


                        Submitted on Briefs:   January 4, 1996

                                  Decided:   April 5, 1996

Filed:

                        Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

Thomas and Joanne Nichols filed a petition in the District Court for the Twenty-First Judicial District in Ravalli County for permanent guardianship of D.T.N. After a hearing, the court entered its order in which it appointed the petitioners as D.T.N.'s permanent guardians. Krista Dickman, the mother of D.T.N., appeals the court's order. We reverse the order of the District Court.

The issue on appeal is whether the District Court erred when it appointed the Nicholses to be D.T.N.'s permanent guardians.

### FACTUAL BACKGROUND

Krista Dickman is the natural mother of D.T.N., who was born on July 27, 1992. Arturo T. Nichols is D.T.N.'s natural father. Krista and Art were never married to each other and no determination has been made that one is entitled to D.T.N.'s custody as opposed to the other.

After D.T.N.'s birth, Art and Krista lived together or separately in various places including Montana, Washington, and California. In July 1994, Krista arrived in Idaho where, on July 12, 1994, she executed a notarized document which evidenced her intent to temporarily relinquish physical custody of D.T.N. to her sister and mother. Krista then left and traveled across the country.

Eventually, Krista's sister brought D.T.N. back to Montana and in September 1994, Thomas and Joanne Nichols, the paternal grandparents of D.T.N., began taking care of him. On September 23,

1994, the Nicholses filed a petition for a temporary guardianship of D.T.N. The court heard evidence in support of the petition. However, before an order was entered, Krista and the Nicholses entered into an agreement in which Krista consented to the guardianship on a temporary six-month basis. Arturo, D.T.N.'s father, also consented to the guardianship, and on October 26, 1994, the court included the parties' agreement in its order granting temporary guardianship of D.T.N. to the Nicholses.

In December 1994, the Nicholses traveled with D.T.N. to California. While they were gone, Krista married Jeff Dickman and the couple moved into an apartment.

On February 21, 1995, the Nicholses moved the court to appoint them permanent guardians. On March 8, 1995, the court held a hearing to consider that motion. However, before a decision was made by the court, the Nicholses and Krista entered into another agreement in which Krista agreed to satisfy certain conditions during the remaining period of the temporary guardianship. The conditions required that Krista and her new husband take parenting classes, be evaluated for chemical dependency, and if necessary, take chemical dependency classes.

On April 12, 1995, the Nicholses filed a petition for appointment as permanent guardians. On April 18, 1995, Krista filed a withdrawal of consent to temporary guardianship and a petition for removal of guardians and termination of temporary

guardianship. The temporary guardianship expired by law on April 25, 1995.

On May 30, 1995, the court held a hearing to consider the parties' claims. On June 20, 1995, the court issued its order in which it granted the Nicholses' petition. It found that pursuant to § 40-4-221, MCA, the Nicholses had physical custody of the child and that when the physical custody commenced the child was not in the physical custody of either parent; that the natural father consented to the guardianship; that Krista "voluntarily relinquished physical custody of the child in the early summer of 1994" and "did not evidence or demonstrate an intent to resume custody or to provide for the child's care"; that when the child was in Krista's care he was neglected and/or dependent as those terms are defined by § 41-3-102, MCA; and that the child's best interest, pursuant to § 40-4-212, MCA, would be served by the appointment of the petitioners as D.T.N.'s permanent guardians. It also found that Krista and the child's natural father, Arturo T. Nichols, had agreed to resolve ultimate custody and visitation issues by April 25, 1995, the date the Nicholses' temporary guardianship status would otherwise terminate, but that they had failed to do so. The court then concluded that the Nicholses should be awarded permanent guardianship.

DISCUSSION

The issue on appeal is whether the District Court erred when it appointed the Nicholses to be D.T.N.'s permanent guardians.

4

We review a district court's conclusions of law related to the appointment of a guardian, as we do in other cases, to determine if they are correct. *Jim's Excavating Serv., Inc. v. HKM Assocs.* (1994), 265 Mont. 494, 501, 878 P.2d 248, 252. We review the underlying factual findings to determine whether they are clearly erroneous. Rule 52(a), M.R.Civ.P.; *Brown v. Tintinger* (1990), 245 Mont. 373, 377, 801 P.2d 607, 609.

The Nicholses petitioned for appointment as permanent guardians of D.T.N. pursuant to the guardianship provisions of the Uniform Probate Code, found at §§ 72-5-201 through -234, MCA. The Nicholses' arguments and the District Court's order incorporate provisions of the U.P.C., Montana's Uniform Marriage and Divorce Act, and this state's statutes relating to abused and neglected children to construct the legal justification for the District Court's decision. However, since the Nicholses sought permanent guardianship of D.T.N. pursuant to the U.P.C., we will consider the merits of Krista's appeal in that context.

Section 72-5-225(2), MCA, provides in part that:

> Upon hearing, if the court finds that a qualified person seeks appointment, venue is proper, the required notices have been given, <u>the requirements of 72-5-222 have been met,</u> and the welfare and best interests of the minor will be served by the requested appointment, it shall make the appointment.

(Emphasis added). Section 72-5-222(1), MCA, referred to in § 72-5-225(2), MCA, provides that "[t]he court may appoint a guardian for an unmarried minor if all parental rights of custody have been terminated or suspended by circumstances or prior court

order." All criteria set forth in -225(2), MCA, and the requirement imposed by -222(1), MCA, must be satisfied before a court may grant any application for appointment of a permanent guardian.

After a hearing, the District Court granted the Nicholses' petition for permanent guardianship; however, it failed to make a specific finding that Krista's parental rights were "terminated or suspended by circumstances or prior court order." Instead, the court seemingly ignored the requirements of § 72-5-222(1), MCA, made several findings related to custody determinations made pursuant to the Marriage and Divorce Act or termination of parental rights, and concluded that the child's best interest would be served if D.T.N. remained with the Nicholses. We will, however, review the record to determine if Krista's parental rights were "terminated or suspended" as § 72-5-222(1), MCA, requires.

On appeal, Krista contends that her parental rights had not been suspended or terminated by circumstances or prior court order. In fact, both parties concede that no prior court order terminated or suspended her parental right of custody. Therefore, we must determine whether the facts support a finding that Krista's parental rights of custody were "suspended by circumstances."

This Court has interpreted the term "suspended by circumstances" in only one case, *In re Aschenbrenner* (1979), 182 Mont. *540*, 597 P.2d 1156. In *Aschenbrenner*, the natural mother of three children also entrusted the care of her children to paternal

grandparents, although in that case it was for a period of three weeks. When she left the children with the paternal grandparents on a second occasion for a shorter period of time, they refused to return the children to her. Instead, they petitioned for appointment as the children's guardian. *Aschenbrenner*, 182 Mont. at 542-43, 597 P.2d at 1159.

After considering evidence, including the testimony of a social worker who questioned the mother's ability as a parent, the district court granted the petition for a permanent guardianship based on findings similar to those made in this case. *Aschenbrenner*, 182 Mont. at 543-44, 597 P.2d at 1159. The court concluded that based on the mother's inadequacy as a parent, the children were dependent and neglected and that their best interests were served by placing them in the care of their grandparents. *Aschenbrenner*, 182 Mont. at 544, 597 P.2d at 1159. When the mother appealed from the district court's decision, we were asked to decide whether a guardianship proceeding may be used to terminate the custodial rights of a natural parent. We held that parental rights could not be terminated in that manner. *Aschenbrenner*, 182 Mont. at 547-48, 597 P.2d at 1161.

In *Aschenbrenner* we first noted the jurisdictional requirement at § 72-5-222(1), MCA, that parental rights be terminated before a permanent guardian can be appointed, and then considered whether that mother's parental rights of custody had been "suspended by circumstances." *Aschenbrenner*, 182 Mont. at 545, 597 P.2d at 1160.

7

Based on the facts in that case, we held that they had not been terminated. Although it was not a guardianship case, we cited *In re* Doney (1977), 174 Mont. 282, 570 P.2d. 575, in support of our conclusion. Because that case includes facts similar to those in this case, it is worth quoting that part of our *Aschenbrenner* decision.

> *In Matter of Guardianship of Doney* (1977), 174 Mont. 282, 570 P.2d. 575, the natural father of the children left them with his sister-in-law for a period of two months "while he composed himself and prepared to take the children into his home" and thereafter even signed guardianship papers, giving his consent to give temporary custody of the children to his sister-in-law. In rejecting the argument that this showed an abandonment of parental custodial rights, we stated: "Surrender of custody of a minor child by a parent is presumed to be temporary unless the contrary is made to appear." *Doney, 570* P.2d at 577.

*Aschenbrenner,* 182 Mont. at 547, 597 P.2d at 1161.

In *Aschenbrenner* we also concluded that whether the grandparents were better able to provide a good environment for the children than the mother was irrelevant because the mother had a fundamental constitutional right to the custody of her children. We quoted again from *Doney* to the effect that the "best interest of the child" test is only relevant after there has been a showing of dependency or abuse or neglect pursuant to our termination of parental rights statutes, or in custody disputes between two natural parents. *Aschenbrenner*, 182 Mont. at 549, 597 P.2d at 1162. We stated that:

> " *However, where third parties seek custody, it has long been the law in Montana that the right of the natural parent prevails until a showing of a forfeiture of this right. Ex parte Borquin,* 88 Mont. 118, 290 P. 250 (1930). *See also Matter of Fisher,* 169 Mont. 254, 545 P.2d 654 (1976). The

8

> Uniform Marriage and Divorce Act does not change this law. This forfeiture can result only where the parent's conduct does not meet the minimum standards of the child abuse, neglect and dependency statutes."

*Aschenbrenner,* 182 Mont. at 550, 597 P.2d at 1162-63 (quoting *Henderson v. Henderson* (1977), 174 Mont. 1, 10, 568 P.2d 177, 182).

Although the district court in *Aschenbrenner* found, as did the District Court in this case, that the children were "dependent and neglected," we held that that kind of determination could not be made in a guardianship proceeding instituted by paternal grandparents, but only in a proceeding instituted to have children declared dependent and neglected, brought by the county attorney pursuant to Title 41, Chapter 3, of the Montana Code Annotated. *Aschenbrenner,* 182 Mont. at 551, 597 P.2d at 1163.

We noted in *Aschenbrenner* that while the district court's confusion was understandable based on the various statutory schemes governing the termination of parental rights or the custody of children, each scheme had a specific and distinct purpose with its own procedures which must be followed. We held that:

> To insure that minors involved received the full protection of these laws, the procedures should be "rigorously followed." *In re Guardianship of Evans* (1978), 179 Mont. 438, 445, 587 P.2d 372, 376. District [c]ourts must identify and adhere to the proper procedure and standards to be used in the proceedings before them. Only then will the fundamental rights and relationship existing between parent and child be fully realized or, when necessary, properly severed.

*Aschenbrenner*, 182 Mont. at 553, 597 P.2d at 1164.

The phrase "suspended by circumstances" was more recently considered by the Supreme Court of Idaho in a case which involved facts similar to those that exist in this case. In In *re* **Copenhaver** (Idaho 1993), 865 P.2d 979, 980, two minor children had been left in the care and custody of the petitioners in June 1990. On September 13, 1990, they petitioned for guardianship pursuant to Idaho's version of the Uniform Probate Code. They alleged that the mother had voluntarily surrendered their custody and was currently residing in Arizona, that neither of the children's natural fathers had provided any support or care for them, and therefore, that parental rights had been "suspended by circumstances." Temporary guardianship was granted. However, the natural parents moved to set aside the temporary guardianship based on their intent to claim their rights as natural parents. **Copenhaver**, 865 P.2d at 980-81.

Instead, after a hearing, a permanent guardianship was granted and the mother appealed. **Copenhaver**, 865 P.2d at 981.

On appeal, the Supreme Court of Idaho noted that the application for appointment of a guardian of a minor is a statutory proceeding which must proceed based on statutory terms, and not based on principles of equity. **Copenhaver**, 865 P.2d at 983. Based on a guardianship statute identical to Montana's, it concluded that, under the circumstances in that case, before a guardian could be appointed it must first be established that the natural parent's right to custody had been suspended by circumstances. Without such a finding, the Idaho Court acknowledged that an inquiry about the

10

children's best interest would be irrelevant. *Copenhaver*, 865 P.2d at 983-84.

The Idaho Supreme Court noted that in that case the minor children had been left with the petitioners from June 1990 to the date of the hearing in March 1991; that the natural mother had stated that she could not afford her children; and that during their placement with the petitioners the mother had had little contact with her children. In fact, the petitioners had little information about the mother's whereabouts and she had been difficult to locate. In addition, the trial court made findings intended to demonstrate an inadequate level of maternal care, including alcohol and drug abuse. *Copenhaver*, 865 P.2d at 984. Nevertheless, after reviewing decisions from other jurisdictions which had interpreted the phrase "suspended by circumstances," the Idaho Court concluded that when the natural mother appeared in the guardianship proceeding, objected to the guardianship, made it clear that she no longer desired to leave the children and that she was willing and capable of caring for them, and made her whereabouts known, her parental rights were no longer suspended by circumstances. The Idaho Supreme Court held that at that point the magistrate's findings regarding the children's living situation, school enrollment, financial support, and contact with their mother no longer had any relevance. *Copenhaver*, 865 P.2d at 984-85.

The drafting committee's Comment to § 5-204 (the corresponding U.P.C. section to § 72-5-222(1), MCA), promulgated by the National

Conference of Commissioners on Uniform State Laws, also indicates the restrictive nature of the section. The Comment states:

> Nothing in this Article is intended to deal with the status of a so-called natural guardian, with the authority of a parent over a child, or with authority over a child or children that may be conferred by other state laws.
>
> The court [under the Probate Code] is not authorized to appoint a guardian for one for whom a parent has custodial rights or for one who has a parental guardian.

Uniform Probate Code § 5-204 (Comment), 8 U.L.A. 445 (1983) (emphasis added). Similarly, as observed by Richard V. Wellman, in 2 *Uniform Probate Code Practice Manual,* at 511 (1977):

> Under the [Uniform Probate] Code, the power of the court to appoint a guardian for a minor is narrowly limited. . It should be remembered, however, that the court has no power to appoint a guardian at all if the minor has a living parent entitled to his custody or a guardian appointed by the will of a parent [who] is willing to act. The parents and their testamentary appointees have, therefore, priority over everyone whom the court might appoint unless the parents have been deprived of custody.

(Emphasis added.)

We agree that the guardianship provisions of the Probate Code were never intended as a substitute for the custody provisions of our Marriage and Divorce Act, nor the prescribed and demanding procedures established for the termination of parental rights. See §§ 40-4-211 through -226, MCA; §§ 41-3-601 through -612, MCA.

We conclude that Krista's parental rights were not terminated by circumstance. Krista appeared in this action, withdrew her consent to the temporary guardianship, and filed a petition to

12

terminate the temporary guardianship. These actions indicate that she is present and that she has not voluntarily relinquished her right to physical custody of her child. Moreover, Krista's previous surrender of D.T.N. and consent to the implementation of the temporary guardianship is presumed to be temporary unless the contrary is made to appear. *Aschenbrenner*, 597 P.2d at 1161 (quoting *Doney*, *570* P.2d at 577). Therefore, while Krista did voluntarily relinquish physical custody of D.T.N. and consented to the temporary guardianship, that guardianship ended on April 25, 1995. It could not form the basis for termination of her rights as a parent because it was limited by its terms and by statute to a specific period of time.

For these reasons, we conclude that the requirements of § 72-5-222(1), MCA, were not met. Based on our review of the record, Krista's parental rights of custody have not been terminated or suspended by circumstance or prior court order. We therefore conclude that the District Court erred when it awarded permanent guardianship to the Nicholses and we reverse the District Court's order.

_____
Justice

13

We concur:

_J. A. Turnage_
Chief Justice

_Karla M. Gray_

_William E. Hunt_

_R. C. McDonough_

_Fred J. Weber_

_W. William Leaphart_
Justices