No. DA 06-0581

IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 106

IN THE MATTER OF THE GUARDIANSHIP
AND CONSERVATORSHIP OF

J.C. and A.N.C.,

     Minor Children.

APPEAL FROM:    The District Court of the Twentieth Judicial District,
In and For the County of Sanders, Cause No. DN-05-07,
Honorable Deborah Kim Christopher, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        Naomi R. Leisz, Attorney at Law, Thompson Falls, Montana

    For Respondents:

        Amy N. Guth, Attorney at Law, Libby, Montana (Hansons)

        Claude I. Burlingame, Attorney at Law, Thompson Falls, Montana (R.S.)

        John O. Putikka, Putikka Law Office, Thompson Falls, Montana
(Guardian Ad Litem)

        Ken Claflin, *pro se*, Plains, Montana

Submitted on Briefs:  February 28, 2007

Decided:  May 1, 2007

Filed:

_____
Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1     J.C. (eleven years old) and her younger sister A.N.C. (eight years old) were living with their biological father, R.S., when, in July of 2004, R.S. was arrested for deliberate homicide. R.S. executed a special power of attorney, placing the children into the care of Greg Hanson, M.D. and his wife Janice (the Hansons). The Hansons had at one time been foster care providers for J.C. and A.N.C., and had continued to provide significant financial assistance as well as day care for the girls. A.C., the biological mother of J.C. and A.N.C., also granted the Hansons temporary permission to care for the girls.

¶2     On July 27, 2004, the Hansons filed a petition for appointment of temporary guardian for the children, requesting that they be appointed the girls' temporary guardian pending the ability of the parents to care for the children. Ken Claflin, A.C.'s brother, and his wife Melanie (the Claflins) also filed a petition seeking full guardianship of the girls on the same day. A.C. supported the Claflins' petition and admitted in an affidavit filed with the petition that she was unable to adequately care for the girls. The District Court, during the guardianship proceedings, concluded that A.C.'s parental rights were suspended by circumstances and eventually granted full guardianship to the Hansons. A.C. appeals the court's grant of guardianship to the Hansons as well as its determination that her parental rights were suspended by circumstances. We affirm.

¶3     We restate the issues as follows:

¶4     I. Did the District Court properly determine that the mother's parental rights were suspended by circumstances?

2

¶5 II. Did the District Court err in appointing a temporary and then a permanent guardian when the mother had withdrawn her consent?

## BACKGROUND

¶6 A.C. has cerebral palsy, a permanent impairment of the central nervous system, and an estimated I.Q. of 67. A.C.'s income is from Social Security benefits. A.C.'s mother, at the request of the Social Security administration, acts as her payee and pays A.C.'s bills from A.C.'s funds.

¶7 A.C., with assistance from R.S. and others, parented J.C. for the first two years of J.C.'s life, though not without difficulty as evidenced by the numerous visits made by the Department of Public Health and Human Services (the Department) regarding her parenting. Once A.C. was pregnant with A.N.C., however, she became concerned that she would be unable to adequately care for J.C. and a newborn. She therefore asked her brother and his wife, the Claflins, if they would adopt A.N.C. Later she changed her mind and attempted to care for both J.C. and A.N.C. The Department quickly became involved, and A.N.C. was determined to be in "immediate or apparent danger of harm" and was placed in the care of the Department on September 28, 1998. Two months later, J.C. was also placed in the care of the Department. A.C. once again decided to relinquish A.N.C. to her brother, because "she [felt] that she [was] unable to care for both children and keep them safe."

¶8 The Department, instead, created treatment plans for both A.C. and R.S. Both parents were initially unsuccessful at meeting the goals established in the treatment plans. On June 8, 1999, the court found that the children were "youths in need of care" as a

3

result of the unsuccessful treatment plans as well as expert opinion that A.C.'s "ability to parent [was] extremely tenuous at best." Additionally, A.C. had admitted, during a family group conference, that she was not capable of meeting the children's needs.

¶9 On November 23, 1999, A.C. appeared in open court and informed the court that she was willing to relinquish her parental rights. The guardian ad litem (GAL), however, opposed the termination for two reasons. First, he thought that A.C. was trying to improve but was hampered by her disability. Second, he did not feel that the father, R.S., had been given a fair chance to complete a treatment plan.[1] R.S. subsequently completed his treatment plan, and, sometime between July 31 and October 31, 2000, J.C. and A.N.C. were permanently placed with R.S. While the Department *de facto* dropped the youths in need of care case after the girls were permanently placed with R.S., the case was not formally dismissed until December 2004, upon motion by the State. The State moved for dismissal of the case "at the request of the parties."

¶10 The Hansons provided foster care for A.N.C. and J.C. during the time they were in the custody of the Department, a period of approximately two years. Even after the Department placed the girls with R.S., the Hansons continued to provide substantial childcare and financial assistance. In the opinion of the GAL, the Hansons "were still the primary caregivers for [both girls] and . . . appeared to do most of the day-to-day parenting." The Hansons also facilitated visitation between A.C. and her children. In

---

[1]Apparently, the Department's policy is to terminate both parents' rights, not just the rights of one parent.

particular, they often provided transportation for A.C. The Hansons have acted as the children's temporary guardians since R.S.'s arrest and eventual imprisonment.

¶11 The Hansons and the Claflins both submitted petitions for guardianship of the girls on July 27, 2004. The Claflins' contact with J.C. and A.N.C., however, had been somewhat limited up to that point. In fact, the Claflins had only visited the girls on two occasions prior to petitioning for guardianship. A.C., however, was in favor of her relatives assuming guardianship. To that end, she signed and filed with the court a "consent of mother" document in which she stated: "I am unable to care for my children myself." Additionally, in the Claflins' petition for guardianship, they contended that A.C. was "incapacitated and unable to adequately care for her children . . . ."

¶12 In order to keep the "status quo," the parties initially stipulated that the Hansons would keep the girls pending the outcome of the guardianship proceedings. On December 21, 2004, the court appointed the Hansons as temporary guardians. The court later, after several motions, issued a scheduling order requiring that all pretrial motions be submitted before September 29, 2005. Despite the order, A.C., through her attorney, filed a motion to dismiss the Hansons' petition on October 6, 2005, for the first time raising the issue of the status of A.C.'s parental rights. On October 31, at the hearing initially scheduled to determine final guardianship, the court determined that, despite A.C.'s late filing, her motion was of sufficient importance that the matter should be suspended until all parties could respond. As a result, the court found it necessary to extend the Hansons' temporary guardianship.

¶13    During the January 3, 2006, scheduling conference the court determined that in this particular case, a hearing on whether A.C.'s parental rights were suspended was not required.   Nevertheless, the court allowed the parties to brief the matter and reserved February 7, 2006, for a hearing if one was deemed necessary by the parties.   Although A.C. filed motions with the court on January 12 and March 2, 2006, she failed to request a hearing in either motion.

¶14    On March 2, 2006, the court determined that A.C.'s parental rights were "'suspended or limited' by circumstances of her disability."   The court denied her motion to dismiss as untimely and wholly inconsistent with: (1) A.C.'s previous sworn representations to the court; (2) A.C.'s concessions in support of her brother's petition; and (3) the court's previous rulings.   Also on March 2, 2006, A.C., for the first time, explicitly revoked her previous consent to the Hansons as temporary guardians.

¶15    At the final hearing on April 21, 2006, A.C. did not testify nor did she call any witnesses.   Instead, her attorney explained to the court that, because of the court's ruling that A.C.'s rights had been suspended or limited by circumstances, she "did not prepare today or bring witnesses or anything to present evidence on whether or not [A.C.] is capable of parenting her children."   Testimony was received from the Claflins, the Hansons, and the GAL, as well as a clinical psychologist who had interviewed the girls and a psychologist and social worker whom J.C. had been seeing in therapy.   The GAL and both psychologists recommended that the girls stay with the Hansons, primarily for the sake of continuity and because the girls, especially A.N.C., had formed the strongest attachment to the Hansons.

¶16 The court concluded that it was in the girls' best interests to appoint the Hansons as full guardians. The court found that the Hansons are in the best position to maintain relationships with everyone involved, including A.C. and R.S. The court was also persuaded by the nature and length of the girls' relationship with the Hansons and the testimony that harm would result if the girls were removed from the Hansons' care. The court reiterated its former determination that A.C.'s rights had been suspended by circumstances. Additionally, the court reasoned that a hearing concerning the suspension of A.C.'s rights was not necessary because § 72-5-222, MCA, does not expressly require a hearing, and, in any case, A.C. waived her right to a hearing by not requesting one. Further, the court found that A.C. had, on numerous occasions, admitted that she is unfit to parent J.C. and A.N.C and she had not had custody of the girls since 1999. In fact, the first attempt that A.C. made to secure her custodial rights, beyond seeking dismissal of the Hansons' petition, was on April 19, 2006, two days before the final hearing.

¶17 A.C. appeals the court's order granting guardianship to the Hansons and the court's determination that A.C.'s parental rights have been suspended by circumstances.

**STANDARD OF REVIEW**

¶18 We review a district court's conclusions of law related to the appointment of a guardian to determine if they are correct. *In re Guardianship of D.T.N.*, 275 Mont. 480, 483, 914 P.2d 579, 580 (1996) (citations omitted). We review the underlying factual findings to determine whether they are clearly erroneous. *D.T.N.*, 275 Mont. at 483, 914 P.2d at 580 (citations omitted). Evidence that a parent is not fit to care for his or her

7

child must be clear and convincing to justify depriving a parent of custody. *In the Matter of Guardianship of Aschenbrenner*, 182 Mont. 540, 551, 597 P.2d 1156, 1163 (1979).

## DISCUSSION

¶19 **I. Did the District Court properly determine that the mother's parental rights were suspended by circumstances?**

¶20 A.C. contends that the District Court improperly determined that her parental rights were suspended because: (1) the court did not hold a hearing; (2) A.C. had put forth sufficient efforts to assert her rights; and (3) a probate proceeding is an improper forum to determine the status of a parent's custodial rights.

¶21 *A. Was a hearing required?*

¶22 According to A.C., the District Court violated her right to due process by not holding a full hearing prior to determining that her parental rights were "suspended by circumstances."

¶23 Under the Uniform Probate Code, as adopted by Montana, "[t]he court may appoint a guardian for an unmarried minor if all parental rights of custody have been terminated or if parental rights have been *suspended or limited by circumstances* or prior court order." Section 72-5-222(1), MCA (emphasis added). This section does not explicitly require a hearing to determine whether parental rights have been suspended by circumstances. A natural parent has a fundamental liberty interest to the care and custody of her child that must be protected by fundamentally fair procedures. *In re C.R.O.*, 2002 MT 50, ¶ 10, 309 Mont. 48, ¶ 10, 43 P.3d 913, ¶ 10 (citations omitted). Due process does not, however, require that the defendant in every civil case actually have a hearing on the

8

merits. *Boddie v. Connecticut*, 401 U.S. 371, 378-79, 91 S. Ct. 780, 786 (1971). Furthermore, an individual can expressly or impliedly waive her right to a hearing as long as the waiver is knowledgeable and voluntary. *Stuart v. Dept. of Social & Rehab. Serv.*, 247 Mont. 433, 437, 807 P.2d 710, 712 (1991) (citations omitted).

¶24    Here, we need not address whether a hearing was required to determine if A.C.'s rights had been suspended by circumstances because A.C. knowingly and voluntarily waived her right to a hearing.  At the January 3, 2006, scheduling conference, all parties were in agreement that a hearing on the matter of A.C.'s parental rights was not necessary.   Nonetheless, the court preserved the opportunity for a hearing and informed all parties, including A.C., that they could request a hearing in their briefs.  The court conditionally set a hearing for February 7, 2006.  A.C. did not request a hearing, appear on that date, or request a hearing on any other date.  The court was thus justified in concluding, based on A.C.'s conduct, that she waived her right to a hearing.

¶25    *B.    Was there sufficient evidence to overcome A.C.'s assertion of her parental rights?*

¶26    A.C., citing to *Aschenbrenner* and *D.T.N.*, further contends that the court had insufficient evidence to find that her parental rights were suspended because she appeared at every hearing, filed a formal withdrawal of consent, and filed a motion to dismiss the Hansons' petition.

¶27    In *Aschenbrenner*, the mother appealed the district court's grant of permanent guardianship to the paternal grandparents. As there was no court order suspending parental rights, we looked to whether the rights were suspended by circumstances, noting

9

that evidence that a parent is not fit to care for her children "must be clear and convincing to justify depriving a parent of custody of her children." *Aschenbrenner*, 182 Mont. at 546, 551, 597 P.2d at 1160, 1163. The only evidence indicating that the mother had abandoned her parental rights was that she left her children with their grandparents for a period of three weeks. *Aschenbrenner*, 182 Mont. at 547, 597 P.2d at 1161. As such a temporary event was insufficient to show that the mother's rights were suspended by circumstances, and as only one person testified that the mother was unfit, we held that the order appointing a guardian was not supported by clear and convincing evidence. *Aschenbrenner*, 182 Mont. at 550-51, 597 P.2d at 1163.

¶28 In *D.T.N.*, the district court "seemingly ignored the requirements of § 72-5-222(1), MCA," and failed to specifically conclude that the mother's parental rights were terminated or suspended. *D.T.N.*, 275 Mont. at 483, 914 P.2d at 581. We therefore, as in *Aschenbrenner*, analyzed whether the facts supported a conclusion that the mother's parental rights were "suspended by circumstances." We noted that the mother had "appeared in this action, [withdrawn] her consent to the temporary guardianship, and filed a petition to terminate the temporary guardianship," all of which indicated that she had not voluntarily relinquished her rights. Moreover, the mother's only relinquishment of custody was temporary and voluntary. *D.T.N.*, 275 Mont. at 488, 914 P.2d at 583-84. For these reasons, we concluded that the mother's rights had not been suspended by circumstances and reversed the district court's order of permanent guardianship. *D.T.N.*, 275 Mont. at 488, 914 P.2d at 584.

10

¶29 Here, unlike the courts in *Aschenbrenner* or *D.T.N.*, the District Court specifically determined that A.C.'s parental rights were suspended by circumstances based in part on the testimony of A.C. who informed the court, both in person and by affidavit, that she was incapable of caring for her children, and admitted as much to the GAL and to her brother.

¶30 Additionally, another Montana district court had previously found that the children were abused or neglected in the 1998 youth in need of care case. In that case the Department, based on its observations and the opinion of its expert, a psychologist, opined that A.C.'s ability to parent was "extremely tenuous at best." Furthermore, A.C. has a somewhat low I.Q. of 67 and has cerebral palsy, an irreversible neurological disorder. Finally, A.C. has not had custody of her children since 1999, a significantly longer period of time than in either *Aschenbrenner* (three weeks) or *D.T.N.* (about one year).

¶31 While A.C. did appear in this action and eventually asserted her parental rights, she originally joined in the Claflins' petition for guardianship and voluntarily relinquished her parental rights by admitting that she was unfit to parent her children. A.C.'s relinquishment of custody, therefore, was not temporary and was only voluntary in the sense that she admitted she was unable to parent. Given the clear and convincing evidence that A.C. was not fit to care for her children, the court was justified in concluding that her parental rights were suspended by circumstances despite A.C.'s belated assertion of her custodial rights.

11

¶32 *C. Did the District Court have the authority, under § 72-5-222(1), MCA, to determine that A.C.'s parental rights had been suspended by circumstances?*

¶33 A.C. also argues that the actions of the District Court *de facto* terminated her parental rights. Such a ruling, according to A.C., was outside the power of the court because a probate court does not have the power to terminate the rights of a natural parent. Additionally, A.C. contends the court erred by making findings as to her "fitness" and "capability."

¶34 As A.C. notes, we stated in *D.T.N.* "that the guardianship provisions of the Probate Code were never intended as a substitute for . . . the prescribed and demanding procedures established for the termination of parental rights." 275 Mont. at 487-88, 914 P.2d at 583. Further, in *Aschenbrenner*, we determined that whether the grandparents were better able to provide a good environment for the children than the mother was irrelevant, because the mother had a fundamental constitutional right to the custody of her children. 182 Mont. at 549, 597 P.2d at 1162.

¶35 The Probate Code, at § 72-5-222(1), MCA, however, does allow a district court to determine, in a guardianship proceeding, that a parent's rights are suspended by circumstances. Section 72-5-222(1), MCA, permits a court to appoint a guardian if parental rights have been: (1) terminated; (2) suspended or limited by circumstances; or (3) suspended or limited by a prior court order. The probate court in the present guardianship proceeding is the appropriate court to determine whether parental rights have been suspended by circumstances. In the case at bar the court determined, without objection, that R.S.'s parental rights were suspended by circumstances because he was in

12

prison serving a life sentence. Although no prior court had terminated or suspended R.S.'s parental rights, his rights were suspended by the circumstances of his imprisonment, and the court had the authority to make that determination pursuant to the Probate Code at § 72-5-222(1), MCA.

¶36 Additionally, while the District Court did consider the best interests of the children, it was in the context of appointing the Hansons, as opposed to the Claflins, as guardians for the girls, not in the context of determining that A.C.'s parental rights were suspended by circumstances. In fact, the court was required by § 72-5-225, MCA, to determine that "the welfare and best interests of the minor will be served by the requested appointment . . . ."

¶37 Thus the court did not improperly terminate A.C.'s rights but instead determined, pursuant to § 72-5-222(1), MCA, that A.C.'s parental rights were suspended by circumstances based on clear and convincing evidence.

¶38 **II. Did the District Court err in appointing a temporary and then a permanent guardian when the mother had withdrawn her consent?**

¶39 A.C. also contends that her October 6, 2005, motion to dismiss should have terminated the Hansons' temporary guardianship. She asserts that a guardianship based on parental consent must terminate when that consent is withdrawn. Here, the guardianship was based on the consent of the parties and she contends the court should have surmised that by submitting a motion to dismiss the Hansons' petition, A.C. was implicitly revoking her prior consent to the Hansons' temporary guardianship as well.

13

Additionally, even if A.C.'s withdrawal of consent did not serve to immediately terminate the guardianship, it should have expired, by law, six months from October 6.

¶40     Section 72-5-224, MCA, allows a court to appoint a temporary guardian, but limits the authority of the temporary guardian to six months. Section 72-5-224, MCA, does not, however, explicitly prevent a court from re-appointing a temporary guardian after the initial six months if extra time is needed to properly complete the requirements of § 72-5-225, MCA (listing the procedures for appointment of a permanent guardian). In *Aschenbrenner*, we noted, with disapproval, that the temporary guardianship had been continued for fourteen months. *Aschenbrenner*, 182 Mont. at 552, 597 P.2d at 1164. We were concerned, in *Aschenbrenner*, with the extended length of the temporary guardianship primarily because the mother's parental rights were not suspended by circumstances or court order.

¶41     Here, as described above, A.C.'s parental rights were suspended by circumstances. Also, the court extended the temporary guardianship past October 6, 2005, specifically because A.C. had filed a motion to dismiss *after* the September 29, 2005, deadline for pretrial motions. Furthermore, during the October 31, 2005, hearing, which had been scheduled as the final guardianship hearing, A.C. again agreed to maintain the status quo while A.C.'s new issues were addressed. Finally, A.C. had originally consented to the Hansons' temporary guardianship in July of 2004 and did not expressly revoke her consent until March 2, 2006, some eighteen months later. The District Court thus did not err by extending the Hansons' temporary guardianship and thereby maintaining the status quo until it was able to appoint a permanent guardian.

14

¶42 Finally, the court did not err by appointing the Hansons as permanent guardians over A.C.'s objection. By April 21, 2006, the date of the final hearing, the parental rights of both parents were suspended by circumstances. Consequently, the court did not need either parent's consent to appoint a guardian. Rather, the court was bound by the requirements of § 72-5-225, MCA.

## CONCLUSION

¶43 The District Court properly determined that A.C.'s parental rights were suspended by circumstances and did not err by appointing the Hansons as temporary and then permanent guardians. We therefore affirm the judgment of the District Court.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ KARLA M. GRAY
/S/ PATRICIA COTTER
/S/ JOHN WARNER
/S/ BRIAN MORRIS
/S/ JAMES C. NELSON
/S/ JIM RICE