No. 01-700

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 50

IN THE MATTER OF C. R. O.,

A Youth in Need of Care.

APPEAL FROM:    District Court of the Third Judicial District,
In and for the County of Anaconda-Deer Lodge,
Honorable Ted L. Mizner, Judge Presiding

COUNSEL OF RECORD:

For Appellant:

Douglas J. DiRe, Dayton Law Firm, Anaconda, Montana

For Respondent:

Honorable Mike McGrath, Attorney General; Ilka Becker, Assistant
Attorney General, Helena, Montana

Michael B. Grayson, County Attorney, Anaconda, Montana

Sherry Petrovich Staedler, Attorney at Law, Anaconda, Montana
(For Youth)

Submitted on Briefs:   January 24, 2002

Decided:   March 21, 2002

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1    Appellant, the father of C.R.O., appeals from the judgment of the District Court for the Third Judicial District, Anaconda-Deer Lodge County, terminating his parental rights. We reverse the judgment of the District Court.

¶2    Appellant presents the following issue on appeal:

**¶3    Did the District Court err in concluding that sufficient evidence was presented to terminate Appellant's parental rights without a treatment plan pursuant to § 41-3-609(4)(b), MCA?**

¶4    C.R.O. was born on October 18, 2000, to Ross and A.O., father and mother respectively. The District Court terminated the parental rights of Ross and A.O. on August 1, 2001. A.O. does not appeal the termination of her parental rights.

¶5    Due to its previous involvement with Ross and A.O., the Montana Department of Public Health and Human Services, Division of Child and Family Services (Department), petitioned for Temporary Legal Custody and Protective Services on the day of C.R.O.'s birth, and the District Court granted the petition that same day. C.R.O. was placed in foster care upon discharge from the hospital. The District Court held a hearing on the petition on November 8, 2000, adjudicated C.R.O. a youth in need of care, and granted temporary legal custody to the Department.

¶6    At the request of the Department, psychological examinations of Ross were conducted by Dr. Ned Tranel and Dr. Robert N. Page. On March 22, 2001, the Department petitioned for termination of Ross' parental rights without implementation of a treatment plan, pursuant to § 41-3-609(4)(b), MCA, which provides:

> **Criteria for Termination** . (4) A treatment plan is not required under this part upon a finding by the court following hearing if:
>
> . . .
>
> (b) two medical doctors or clinical psychologists submit testimony that the parent cannot assume the role of parent.

¶7    This statute authorizes the district court to terminate the parental rights of an individual without

establishing a court-approved treatment plan if two medical doctors or clinical psychologists testify that the individual cannot assume the role of parent. Pursuant to this provision, the Department asserted, based upon the two psychological evaluations, that Ross was unable to parent a child and that his condition was unlikely to change within a reasonable time. After the termination hearing on May 16, 2001, the District Court entered its order on August 1, 2001, terminating Ross' parental rights to C.R.O.

¶8    In In re Baby Boy Scott (1988), 235 Mont. 253, 255, 767 P.2d 298, 299-300, this Court addressed the termination of parental rights without a treatment plan under the statutory scheme then in effect. The Court there grafted the additional requirement that termination of parental rights without the benefit of a treatment plan required that the doctors "must also testify that the . . . condition of the parent is unlikely to change within a reasonable time." In re Baby Boy Scott, 253 Mont. at 255, 767 P.2d at 299-300. We continue to acknowledge that this is an appropriate requirement under the current statute. If the Department is to bypass an attempt to rehabilitate the parent and reunite parent and child, it must demonstrate that the parent's inability to assume the role of parent cannot be remedied within a reasonable time. Section 41-3-609(1)(f)(ii), MCA.

¶9    Ross contends that the District Court erred in determining that the statutory criteria for termination of his parental rights under § 41-3-609(4)(b), MCA, were established by clear and convincing evidence. Ross does not challenge the testimony of Dr. Tranel as conclusive that Ross could not assume the role of parent, but argues that the testimony of Dr. Page is not in agreement with the testimony of Dr. Tranel. Ross argues that the combined testimony of the two psychologists does not support the District Court's conclusion that clear and convincing evidence existed to waive the treatment plan pursuant to § 41-3-609 (4)(b), MCA.

¶10    In reviewing a decision to terminate parental rights, this Court determines whether the district court's findings of fact supporting termination are clearly erroneous and whether the district court's conclusions of law are correct. In re A.C., 2001 MT 126, ¶ 20, 305 Mont. 404, ¶ 20, 27 P.3d 960, ¶ 20 (citation omitted). A finding of fact is clearly erroneous if it is not supported by substantial evidence; if the district court misapprehended the effect of the evidence; or if, after reviewing the record, this Court is left with a definite and firm conviction that the district court made a mistake. In re J.N., 1999 MT 64, ¶ 11, 293 Mont. 524, ¶ 11, 977 P.2d 317, ¶11 (citations omitted). It is well-established that a natural parent's right to care and custody of his or her child is a fundamental liberty interest which must be protected by fundamentally fair procedures. In re A.C., ¶ 20. Accordingly, in regard to the statutorily-required findings supporting termination of parental rights, we have stated that the burden is on the party seeking termination to demonstrate by clear and convincing evidence that every requirement set forth in the statute has been satisfied. In re A.C., ¶ 20.

¶11    Dr. Tranel based his testimony upon review of voluminous records generated from the time Ross was a young child, himself adjudicated a youth in need of care, and from an independent psychological evaluation. Dr. Tranel testified that Ross had been given more psychiatric labels than anybody he has ever seen, including ADHD, a major depressive disorder, learning disability, paraphilia, oppositional defiant disorder, gender identity disorder and sexual addiction.

¶12    After his independent evaluation, Dr. Tranel concluded that his findings were consistent with the

previous psychological test data. Dr. Tranel testified he was particularly concerned with Ross' antisocial personality disorder, which "suggests that he could become aggressive and harmful to a non-retaliatory capable victim." He concluded that it would not be in C.R.O.'s best interest if Ross were to be the custodial parent. Ultimately, when asked how much time he thought it would take with intensive support therapy for Ross to have the ability to successfully parent a young child, Dr. Tranel responded, "[y]ears, perhaps decades would be more accurate."

¶13 Ross contends that the conclusions of Dr. Page do not agree with Dr. Tranel's conclusions. He argues that, contrary to the requirements of the termination statute, Dr. Page believed that Ross should have been given the opportunity to acquire parenting skills and become a productive parent with the help of an intensive and supervised treatment plan and further believed that it was possible for Ross to complete the treatment plan within fifteen months. Ross points to Dr. Page's following testimony upon cross-examination to support his argument:

Q: Dr. Page, you're not saying that my client can not learn, correct?

A: Correct.

Q: In fact you stated I believe, in your report that he's in the average range of intelligent functioning, intellectual functioning?

A: That would be based on reviewing Dr. Tranel's results that indicated he was in the average range, intellectually.

Q: So that means he can process information, learn new skills, and apply those skills when it comes to parenting a child?

A: Cognitively, you know Dr. Tranel can get more specific on scale score, the meaning of the breakdown on the scale scores. But basically with the full scale IQ in the average range it doesn't suggest any deficits necessary in his ability to obtain the knowledge and skills.

Q: And I believe Dr. Tranel didn't find any specific learning disabilities, correct?

A: I don't think so.

Q: Okay. So Ross would be able to process new information, learn and acquire new parenting skills and abilities when it comes to parenting a child?

A: Theoretically. I don't know that there are any specific other neurological problems Dr. Tranel might be able to identify. Theoretically, there should be nothing, nothing stands out that would stop him from being able to learn, to acquire knowledge.

Q: And is it your opinion that he would benefit from a treatment program?

A:  Yes sir.

. . . .

Q:  At this time.  Do you believe that–that your report concluded that given the opportunity with strict supervision and an on-going treatment plan which may provide continuous monitoring by trained professionals that at some point in time Ross may assume a parenting role?

A:  Theoretically, it's possible.

. . . .

Q:  In any event, would you agree with me Dr. Page that Ross should be given the opportunity to acquire parenting skills and become a productive parent?

A:  If he hasn't already been given the opportunity to be trained and acquire the knowledge, but I think that with the caveat that his history of acts of deviance as well as marijuana use, etcetera, of long standing nature leave him at [sic] a vulnerable person to maintain presence in such a treatment plan and there's a question as to how much that–It would have to be monitored and measured from the standpoint of progress being made, very closely, in my opinion.

¶14   Ross additionally points to the following cross-examination of Dr. Page by C.R.O.'s guardian ad litem:

Q:  Mr. DiRe had asked you questions about can he parent or can he learn what he needs to learn to parent, and you indicated that it's possible at some time he can be taught that.  There's a presumption in Montana that fifteen (15) months out of home placement that termination is in the child's best interest.  Could he learn anything substantial in fifteen months?

A:  Ah, yes, theoretically.  There's not a deficient intellectual capacity with [sic] which would prohibit him from being able to absorb and retain knowledge, that I know of.  There are some vulnerabilities and some high risks against suggesting, difficulty in obtaining such necessary knowledge and lowered impulse; increased impulse control, etcetera, etcetera.  Particularly surrounding the risks that I've identified in my report in fifteen months. It's possible.

Q:  So is it fair to say that he has the intellectual ability to learn how to parent but given his background and his diagnosis, he may not be able to accomplish that in a reasonable time?

A:  He has significant vulnerabilities.  I should say liabilities that he brings into such a treatment plan that would have to be addressed specifically.

Q: Could he learn that within a reasonable time given his own history and his own background in spite of his cognitive abilities to assess parenting techniques?

A:   It would be very difficult.  I'm not going to say it's impossible.

¶15    According to Ross, the treatment plan was improperly waived in this case as the foregoing testimony of Dr. Page falls short of, and negates, any reasonable conclusion that clear and convincing evidence exists that he cannot assume the role of a parent within a reasonable time with the help of a treatment plan.

¶16    The Department counters that the above testimony, taken out of context, does not fairly characterize the conclusions of Dr. Page.  The Department argues that the District Court relied on Dr. Page's concurrence with Dr. Tranel that Ross was multi-handicapped and unable to provide a minimal standard of parenting for a young child at this time.  The Department also argues that to terminate parental rights pursuant to § 41-3-609(4)(b), MCA, the district court need not find that a parent is unable to learn and never able to parent in the foreseeable future, rather, only that the parent "is unable to assume the role of parent at this time and unable to do so within a reasonable time.  The Department contends that, while Dr. Page did not rule out the possibility that Ross could ever assume a parenting role, he clearly testified that Ross could not do so within a reasonable amount of time.  We disagree with the Department's assessment of Dr. Page's testimony.

¶17    Upon review of the full testimony of Dr. Page, this Court is at a loss to discover testimony directly supporting a conclusion by Dr. Page that Ross could not assume the role of parent within a reasonable time.  When asked on direct examination how long it would take for Ross, in the ideal program, before he could successfully parent a young child, he responded that, while it would not likely be within the next year, it is "awfully hard to nail down a particular time frame because it's dependent on so many variables . . . .  I don't know how long that would take for Ross."

¶18    Dr. Page gave no stronger conclusion on cross-examination or upon examination by the guardian ad litem.  Rather, when asked whether Ross could learn anything substantial within fifteen months and assume a parenting role, he responded that, although it would be difficult, it was theoretically possible.  Dr. Page testified that Ross is of average intellectual functioning and theoretically can process new information, learn and acquire new parenting skills and abilities.  Dr. Page opined that Ross could theoretically assume the role of parent if given the opportunity to participate in an ongoing treatment plan with strict supervision and continuous monitoring by trained professionals.

¶19    The Department argues that the District Court also relied on Dr. Page's concurrence with Gwen Farnsworth, Ross' former social worker and outpatient adolescent sex offender therapist.  The Department refers to the November 29, 2000, letter from Gwen to the Department wherein she opined that "under no circumstances do I believe he should be in the position to control the destiny of a child."  When asked whether he agreed with Gwen's statement that under no circumstances should Ross be in the position to control the destiny of a child, Dr. Page again specifically stated that, "[a]t this point in time, the statement about 'should not be in the position to control the destiny of a child' would be accurate" (emphasis supplied).

¶20    To terminate a parent's rights pursuant to § 41-3-609(4)(b), MCA, it is insufficient that both

psychologists agree merely that a parent is currently unable to assume the role of parent. Both must also agree that the condition making a parent unable to assume the role of parent be unlikely to change within a reasonable time. In re Baby Boy Scott, 253 Mont. at 255, 767 P.2d at 299-300; § 41-3-609(1)(f)(ii), MCA. The record contains substantial evidence that Dr. Page, Dr. Tranel and Gwen Farnsworth agree that Ross is currently unable to assume the role of parent. However, the record is bereft of testimony by Dr. Page that the condition making Ross currently unable to parent is unlikely to change within a reasonable time.

¶21    Rather, the District Court extrapolated the conclusion that Ross' condition was unlikely to change within a reasonable time from Dr. Page's testimony that despite years of counseling and therapy, Ross has not been able to achieve mastery of the tools he needs to manage his own life. The District Court concluded that, as Dr. Page did not provide the Court with a "reasonable timeframe" in which Ross may "theoretically" be able to manage the life of a child, and based upon Ross' longstanding history, his condition is unlikely to change within a reasonable time.

¶22    The requirements of § 41-3-609(4)(b), MCA, are not satisfied simply because a parent has had a long and troubled psychological past, nor because a clinical psychologist does not provide the district court with a reasonable time frame for successful rehabilitation. It is essential that the testimony of two clinical psychologists clearly and convincingly establish that the condition of the parent is unlikely to change within a reasonable time. The testimony of Dr. Page does not clearly and convincingly support this finding.

¶23    The dissents offer arguments which tug at the heart, but miss the law. Justice Cotter acknowledges that Dr. Page did not offer testimony in accordance with statutory terms, but nonetheless asserts that the Court should deem the statute satisfied from the "theme" and "tone" of his testimony. Justice Nelson argues that the Court has blindly elevated form over substance, ignoring both the purpose of the statute and C.R.O.'s constitutional rights. While he stops short of advocating that this Court do away with the controlling provision, § 41-3-609(4)(b), MCA, he clearly implies that the Court should ignore the requirements of that statute in this case.

¶24    The Court does not have the option of choosing to ignore the plain wording of a statute, even when those words mandate a result deemed undesirable. Nor can we, by a "between-the-lines" assessment of a witness's tone and theme, create testimony that does not exist in the transcript.

¶25    The dissents suggest that if this Court would only view substance over "form" (the requirements of the statute), that Ross's long and troubled past, in conjunction with his extensive psychological labels, demonstrates that the current condition that renders Ross unable to assume the role of parent is unlikely to change within a reasonable time. However, the statute specifically requires two doctors or psychologists to testify to that conclusion. Undisputably, Dr. Page did not.

¶26    The record, viewed as a whole, may reveal a history of extensive counseling and a "failure [of Ross] to achieve the tools" to manage his own life, but this Court is constrained first to determine whether substantial evidence exists to support the statutory requirements. In re J.N., ¶ 11 (citations omitted). Because the record does not support a finding that two psychologists agree that Ross'

condition is unlikely to change within a reasonable time, the basic statutory requirements to terminate Ross' parental rights, without the benefit of a treatment plan, are not met.

¶27    We hold that substantial evidence does not exist to support the District Court's finding that Dr. Page believed that the condition preventing Ross from assuming the role of parent is unlikely to change within a reasonable time.  In re Baby Boy Scott, 253 Mont. at 255, 767 P.2d at 299-300.  The District Court's finding is therefore, clearly erroneous.  In re A.C., ¶ 20 (citation omitted).

¶28    We reverse and remand for proceedings consistent with this opinion.

/S/ JIM RICE

/S/ KARLA M. GRAY
/S/ JIM REGNIER
/S/ TERRY N. TRIEWEILER

Chief Justice Karla M. Gray, specially concurring.

¶29    I concur in the result the Court reaches in this case.  I am not persuaded, however, that, in enacting § 41-3-609(4)(b), MCA, which permits the Department to terminate a parent's rights without a treatment plan upon the testimony of two medical doctors or clinical psychologists that the parent "cannot assume the role of parent," the Legislature intended only the same "within a reasonable time" standard applicable to § 41-3-609(1)(f), MCA, cases where a treatment plan has been adopted, the parent has failed to complete--or to successfully complete--the treatment plan, and the trial court determines the conduct or condition of the parent rendering him or her unfit is unlikely to change "within a reasonable time."

¶30    The Legislature did not state a time frame for application of the § 41-3-609(4)(b), MCA, exception to the treatment plan requirement.  Clearly, it did not mean that the parent merely could not assume the role of parent "at this very moment."  Just as clearly, it did not mean that the two doctors or psychologists were required to testify that the parent could "never" assume the role of parent.  As a result, the Court necessarily falls back on the "within a reasonable time" standard.  This time frame seems inappropriately short to me in this type of case where no treatment plan is offered.

¶31    We have held repeatedly that a parent has a fundamental liberty interest in parenting his or her child.  See, e.g., In re J.N., 1999 MT 64, ¶ 12, 293 Mont. 524, ¶ 12, 977 P.2d 317, ¶ 12 (citations omitted).  That constitutional right must be protected by fundamentally fair procedures.  In re J.N., ¶ 12. In addition, Montana's policies with regard to abused and neglected children, while making the health and safety of the children the paramount concern, also require the Department to "preserve the unity and welfare of the family whenever possible."  See § 41-3-101, MCA.

¶32    The Department ordinarily, and properly, makes serious efforts to meet this latter requirement by means of permitting a parent to complete a treatment plan and, often, a series of treatment plans.  Under

that approach, the Department proceeds with a petition to terminate parental rights only when it believes--and can prove to a court--that the parent has not completed the treatment plan or the completed treatment plan has not been successful, and the reason therefore is "unlikely to change within a reasonable time." See § 41-3-609(1)(f), MCA. In other words, the parent is afforded an opportunity to establish his or her ability to successfully parent the child, and only when that ability has not been established over a period of time and is unlikely to be established within a reasonable time still to come, can the Department succeed in terminating the parent's fundamental constitutional right to parent his or her children.

¶33    It seems to me that applying the same "within a reasonable time" standard to the exception to the treatment plan requirement set forth in § 41-3-609(4)(b), MCA, as is applied when a parent has not completed or has not successfully completed a treatment plan and the condition rendering the parent unfit is unlikely to change within a reasonable time does not adequately protect the parent's constitutional rights. It also allows the Department to avoid making any effort whatsoever to achieve the state's policy of preserving the unity and welfare of the family whenever possible.

¶34    Under the "reasonable time" standard applied to the § 41-3-609(4)(b), MCA, exception to the treatment plan requirement, the following scenario could occur: the Department could remove a child from its parents at birth; petition on the same day for temporary legal custody and protective services based on "previous involvement" with one or both of the parents; obtain an adjudication that the child is a youth in need of care and temporary legal custody of the child within approximately 120 days (see §§ 41-3-432, 41-3-437, and 41-3-438, MCA); immediately file a petition to terminate parental rights; seek and obtain an immediate hearing after finding two doctors or psychologists to testify that the parent cannot assume the role of a parent within a reasonable time; and have the parent's rights terminated. Conceivably this process could be completed within 5 to 6 months of the child's birth, and without the parent having any opportunity whatsoever to establish the ability to parent and to obtain the Department's help through the provision of appropriate services to achieve that goal. Indeed, in the present case, C.R.O.'s father's rights were terminated less than 10 months after the child's birth.

¶35    I am not unmindful of the importance of protecting Montana's children. Nor, obviously, is the Montana Legislature. I also am not unmindful of the fact that children, as well as parents, have constitutional rights. I simply am not convinced that the Legislature intended such a "rush to judgment" as can occur through the Court's addition--for lack of any other available time frame--of the "within a reasonable time" standard to the exception contained in § 41-3-609(4)(b), MCA, which differs significantly from the other exceptions set forth in § 41-3-609, MCA. Therefore, I encourage the Legislature to revisit the § 41-3-609(4)(b), MCA, exception in light of the Court's interpretation in this case.

¶36    All that being said, I agree totally with the result reached by the Court here.

/S/ KARLA M. GRAY

Justice Terry N. Trieweiler joins in the foregoing specially concurring opinion.

/S/ TERRY N. TRIEWEILER


Justice Patricia O. Cotter dissents.


¶37    As the Court points out in ¶ 8 of its Opinion, where termination of parental rights is accomplished without the benefit of a treatment plan, it can be done only if the doctors who are testifying conclude that the "condition of the parent is unlikely to change within a reasonable time" (emphasis added). While Dr. Page was unfortunately not asked this question in the statutory terms, and therefore did not testify specifically that Ross's condition was "unlikely to change within a reasonable time," this was the clear import of his testimony.

¶38    The excerpts of testimony set forth by the Court in its Opinion demonstrate that Dr. Page, upon cross examination, would do no more than agree that it was "theoretically possible" that Ross would someday be able to assume a parenting role.  Obviously, just about everything is theoretically possible.  However, the balance of Dr. Page's testimony cannot be fairly interpreted to suggest that such an outcome was likely.

¶39    To the contrary, Dr. Page recited Ross's long history of acts of deviance, drug use, aggression, and other handicaps.  On top of this, there was ample evidence that C.R.O. suffered from significant developmental disabilities, which would only further hamper the prospects of Ross's ability to parent.  \

¶40    When Dr. Page's entire testimony, rather than the carefully chosen excerpts relied upon by the majority, is considered, a theme of caution and conservatism is apparent.  While he apparently was unwilling to say in Ross's presence that Ross would never be able to overcome his difficulties or obtain adequate parenting skills, he made frequent references to the serious and long-term nature of Ross's multiple disabilities and the extreme difficulty of overcoming those disabilities.  He explained that the three years of counseling Ross had already undergone was not abnormal treatment for a "case like this" but that even after those three years, Ross continued to "need to learn to perceive the world in a less hostile place" and that "[t]he sexual deviant behaviors have been significant and [Dr. Page] did not perceive in [his] interview process that there was enough evidence that Ross has internalized the tools that he needs to run his own life, yet."

¶41    Dr. Page testified that Ross retained many of the same deficits after three years of counseling that he had prior to counseling, and that it would be unlikely "if [Ross] were in the ideal program" that he could successfully work through his numerous issues within a year's time.  He further explained that speculation as to ". . . the potential for future behavior is typically historical accounts of the same behavior.  That is repeated treatment, repeated events, repeated problems suggest the same in the future."

¶42    The tone of Dr. Page's entire testimony appears to be that of  a doctor unwilling to tell a disabled young man that he will never overcome his difficulties, but the Doctor was also clearly unwilling to say

that his condition was likely to change within a reasonable time.

¶43    A mere theoretical possibility, which is all Dr. Page would concede upon cross examination, and upon which the Court relies in reversing the District Court, is simply not sufficient, in my judgment, to override the otherwise clear and convincing tenor of Dr. Page's testimony, which was that Ross had shown no significant improvement despite three years of counseling, that he was not able to parent, and that his condition was unlikely to change within a reasonable time.

¶44    This Court should not substitute its judgment for that of the District Court in making a finding based to a large extent on credibility and weight of the evidence. In re T.A.G., 2002 MT 4, ¶ 7, 2002 Mont. LEXIS 3, ¶ 7. I would therefore conclude that substantial evidence did exist to support the District Court's finding, and I would affirm.

/S/ PATRICIA COTTER

Justices James C. Nelson and W. William Leaphart join in the foregoing dissent.

/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART

Justice James C. Nelson dissents.

¶45    I concur with and join in Justice Cotter's dissent and make the following additional observations.

¶46    In its rush to exalt the form of Dr. Page's answers over the substance of his testimony, the majority completely loses sight of the primary purpose of parental rights termination proceedings under Title 41, Chapter 3, part 6--to further and protect the best interests of the child. Section 41-3-602, MCA (parent-child relationship may be terminated if the relationship is not in the best interest of the child).

¶47    Furthermore, the Court's decision trammels the inalienable constitutional rights of C.R.O. to pursue life's basic necessities, to enjoy a safe, healthy and happy life (Art. II, Sec. 3, Mont.Const.) and to basic human dignity (Art. II, Sec. 4, Mont.Const.). See also § 41-3-101(1)(f), MCA ("It is the policy of the state of Montana to: (f) recognize that a child is entitled to assert the child's constitutional rights").

¶48    In my view, these guarantees under Montana's Constitution entitle C.R.O. to the opportunity for a permanent, stable and loving family relationship. Indeed, this was the theme of Justice Leaphart's dissent in Girard v. Williams, 1998 MT 231, 291 Mont. 49, 966 P.2d 1155, wherein he observed:

The United States Supreme Court has recognized that the "familial relationship" is more than a mere biological tie:

[T]he importance of the familial relationship, to the individuals

involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in "promot[ing] a way of life" through the instruction of children ... as well as from the fact of blood relationship.

Girard, ¶ 66 (citing Lehr v. Robertson (1983), 463 U.S. 248, 261, 103 S.Ct. 2985, 2993, 77 L.Ed.2d 614, 626 (alteration in original)).

¶49    On the record here, it defies logic and common sense that C.R.O.'s best interests, fundamental constitutional rights, and right to a permanent, stable and loving family relationship will be served by making her the guinea pig of a court-ordered treatment plan for her biological father--a person who has a track record of failure as a parent and who has ADHD, major depressive disorder, learning disability, paraphilia, oppositional defiant disorder, gender identity disorder, sexual addiction, and antisocial personality disorder.

¶50    The majority maintains that the dissents "tug at the heart, but miss the law."  Baloney!  The majority opinion ignores the law--and the "plain wording of [the] statute" by the simple expedient of putting its own spin on the evidentiary record to defeat what the law requires--that the parent/child relationship should be terminated when two medical doctors or clinical psychologists testify that the parent cannot assume the role of a parent--§ 41-3-609(4)(b), MCA--and when the child's best interest would be served thereby--§ 41-3-602, MCA.  Those statutory criteria were met in spades in this case. No "between-the-lines" assessment is necessary.  The fact that the majority have determined otherwise is simply a substitution of this Court's judgment for that of the trial court who actually heard the testimony and judged the credibility of the witnesses.

¶51    More to the point, what benefit is to be gained for C.R.O. by trying to teach a person to parent where that person has absolutely no substantive relationship with his child; where that person, in the words of Dr. Tranel, has been given more psychiatric labels than anybody he has ever seen; and where that person has only a "theoretical possibility" of becoming a parent?  The answer is obvious. There is none--unless finally being able to put a young child into the hands of a sexual deviant is considered a benefit.

¶52    Worse, all the while the government tries to teach Ross to parent via a treatment plan, C.R.O. will be languishing in foster care.  And, when one, two, or three years from now, the State and the courts again conclude what the record already aptly demonstrates--that Ross is unable to parent C.R.O. and that his condition is unlikely to change within a reasonable time--C.R.O. will have been deprived of her constitutional right to an opportunity for a loving, permanent and stable family relationship, apart from her biological father, during the most formative years of her life.

¶53    Once again a child's fundamental constitutional rights have been ground up in the machinery of a statutory scheme weighted overwhelmingly in favor of the biologically-based right to parent to the exclusion or marginalization of other relationships that will be more in the child's (as opposed to the natural parent's) best interest.  See Girard, ¶¶ 78, 79 (Nelson, J. concurring).  Once again, by a blind, form-over-substance interpretation of the evidentiary record, a child has been deprived of her rights to

pursue life's basic necessities, to enjoy a safe, healthy and happy life and to basic human dignity. Once again, the biological parent wins a court case and the child loses a shot at a decent life. How sad. Indeed, how tragic.

¶54   I dissent.

/S/ JAMES C. NELSON


Justices Patricia O. Cotter and W. William Leaphart join in the foregoing dissent.

/S/ PATRICIA COTTER
/S/ W. WILLIAM
LEAPHART