No. 02-684

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 93

I N THE MATTER OF S.C., M.J., C.C., and K.C.,
Youths in Need of Care.

APPEAL FROM:    District Court of the Eighth Judicial District,
                In and for the County of Cascade, Cause Nos. BDJ-01-264-Y; ADJ-01-032-Y(b)
                The Honorable Julie Macek, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

                Carl Jensen, Cascade County Courthouse, Great Falls, Montana

        For Respondent:

                Hon. Mike McGrath, Attorney General, Helena, Montana; Kathleen Jenks,
                Assistant Attorney General, Missoula, Montana

                                Submitted on Briefs:  March 27, 2003

                                        Decided:  April 22, 2003

Filed:

        _____
                        Clerk

Chief Justice Karla M. Gray delivered the Opinion of the Court.

¶1      The birth mother of S.C., M.J., C.C. and K.C. appeals from the order of the Eighth Judicial District Court, Cascade County, terminating her parental rights to the four children. We affirm.

¶2      The issue on appeal is whether the District Court's finding that the condition rendering the mother unfit is unlikely to change within a reasonable time is clearly erroneous.

¶3      The underlying action was filed in February of 2001, after the Department of Public Health and Human Services (Department) took M.J., C.C. and K.C.--then ages 8, 5, and 2, respectively--into protective custody on the basis of physical neglect. S.C. was born in November of 2001, and added to the case at that time. The Department requested temporary legal custody of the children due to its involvement with the family since February of 2000.

¶4      In an affidavit attached to the petition for temporary legal custody, Rachel Coutu, a Department social worker, detailed her first visit to the mother's apartment in May of 2000. At that time, Coutu was following up on referrals to the Department stating that K.C. had bruises on her arm and C.C. often was brought to school very dirty and with a strong urine odor. The Department previously had advised the mother of available resources, including counselors, in February of 2000 after the father of M.J., C.C. and K.C.--who had since moved out of the home--assaulted the mother.

¶5      When Coutu arrived at the apartment, the mother was lying on a bare mattress in the bedroom with her children, watching television. The mother said she had not sent M.J. and

2

C.C. to school that day because she was sick. K.C. was not bruised, but she was naked and covered with ink from soft-tip markers. Coutu observed dirty clothes, silverware, laundry soap, junk, feces, and old food strewn on the floor, plastic containers sitting on the gas stove burners, and a sharp knife on the counter within the children's reach. Based on the filthy and dangerous conditions, Coutu removed the children.

¶6 Coutu's affidavit continued by reporting what she subsequently learned of C.C.'s difficulties at the local Head Start program and M.J.'s problems at school. Head Start reported that C.C. always seemed to wear clothes that were too large for him and had begun coming to school in dirty and inappropriate clothes (for example, sockless sandals on a day it was snowing). C.C.'s attendance at Head Start had been spotty and sometimes no one was home when the driver of the Head Start van tried to drop him off after class. M.J. had been coming to school with a dirty body and clothing and the teachers had been washing him up as best they could.

¶7 The children were returned to the mother in July of 2000, with parenting instruction services continuing in the home. During that summer and fall, the Department received additional referrals, some of which alleged that the mother was living and associating with violent offenders and convicted child molesters.

¶8 Coutu again removed the children from the mother's custody in February of 2001. This removal was precipitated when the mother's apartment manager called the Department around 4 o'clock one afternoon to report that M.J. and K.C. had come to his office saying they had been locked out of the house. A few minutes after Coutu arrived at the apartment

3

manager's office, the mother appeared with C.C. She said she had been upstairs in the bathroom when M.J. and K.C. left the house and had been looking for them ever since. She then changed her story and said she had gone to a neighbor's to make a telephone call, after instructing the other two children not to go outside.

¶9 Coutu again placed M.J., C.C. and K.C. in foster care, and the mother agreed to a treatment plan. When S.C. was born some nine months later, she was immediately placed in foster care as well.

¶10 The mother's treatment plan required her to successfully complete parenting classes, maintain adequate housing and a safe environment for the children and begin mental health counseling and anger management classes. It also required her to attend scheduled visits with the children, maintain contact with the children, and cooperate with the Department.

¶11 As part of the mother's treatment plan, Dr. Pete Stivers, a clinical psychologist, conducted a multi-part psychological evaluation of her. At a hearing held just prior to the Department's filing of a petition to terminate the mother's parental rights, Stivers testified that the mother's intelligence was in the borderline range of ability, making it difficult for her to successfully engage in problem solving in complex or ambiguous situations. In addition, he diagnosed a personality disorder and chronic low-grade depression. Stivers testified that, because of these problems, the mother has great difficulty functioning with ordinary everyday stressors such as paying bills and getting places on time. He testified that parenting multiple children is difficult for her, especially because her children have disabilities. According to Stivers, the mother could probably parent if a parenting aide and therapist

4

worked with her on a regular basis but, without that assistance, her problem-solving abilities were "overwhelm[ed]."

¶12    Department social worker Vickie Leighland testified the mother had completed the court-approved treatment plan, but Leighland did not believe the mother was able to integrate or apply what she had learned because of her cognitive difficulties.  Leighland testified that the mother continued to be attracted to men who are involved in the criminal justice system.

> [The mother] goes up to the jail to visit different men.  She takes her kids up to the jail . . . a lot of these men are felony offenders.  They're violent offenders, they're possible sexual offenders. . . . And I know that she was having these children call these men "uncle."  She writes to men in prison.

Leighland further testified that, while the mother completed her treatment plan, her insight was very limited and she was not able to integrate what she had learned.

¶13    The director of a Healthy Mothers/Healthy Babies parenting program in which the mother, M.J., C.C. and K.C. participated testified that, on several occasions, the mother did not notice that her children had left the room while under her supervision, and then did not know where they were.  A Healthy Mothers/Healthy Babies parent educator testified she was concerned that the mother talked to her children, especially the oldest, more as adults than as children and may not be able to recognize or meet the children's basic needs.

¶14    The Department filed a petition to terminate parental rights in February of 2002.  At the hearing on that petition, professional psychologist Dr. Patrick Davis testified that he had also done a psychological evaluation of the mother, and agreed with Stivers.  Davis testified that, in addition to being limited by a third-grade reading level, the mother had "a number

5

of different types of problematic personality traits, which are described in the jargon as schizoid, avoidant, depressive, self-defeating and paranoid." Davis testified it would be difficult for the mother to manage day-to-day problems children might have under the best of circumstances but, because her children had learning disabilities and emotional and behavioral issues, she was likely to have great difficulty coming up with appropriate and effective solutions to her children's problems.

¶15 Guardian ad litem Patricia Wyeth testified that the mother really and truly loves her children and had made every effort within her ability to make herself acceptable as a parent. According to Wyeth, "if determination and desire" could have changed the mother's parenting style, it would have been changed. However, Wyeth believed there was no reasonable prospect that the mother's ability to parent was going to change.

¶16 The District Court found both of the mother's psychological evaluations indicated that she had serious mental illnesses, emotional problems, and limited intellectual functioning. It found that, although the mother complied with all recommendations regarding counseling, "due to the magnitude of her problems, [she was] simply unable to make sufficient improvement to allow her to safely parent her children." The court determined that the mother had been unable to successfully complete her treatment plan and that the conduct or condition rendering her unfit to parent is unlikely to change within a reasonable time.

¶17 The parental rights of the father of M.J., C.C. and K.C., who did not reside with the mother or the children after February of 2000, also were terminated in the underlying proceedings. He does not appeal. The parental rights of S.C.'s father, who has not been

6

identified, were terminated as well, following notice by publication. The mother appeals.

Standard of Review

¶18 A parent's right to care and custody of her child is a fundamental liberty interest which must be protected by fundamentally fair procedures. Accordingly, the burden is on the party seeking termination to demonstrate by clear and convincing evidence that every statutorily-required finding for termination has been satisfied. We review a decision to terminate parental rights to determine whether the district court's findings of fact supporting termination are clearly erroneous and whether its conclusions of law are correct. *In re C.R.O.*, 2002 MT 50, ¶ 10, 309 Mont. 48, ¶ 10, 43 P.3d 913, ¶ 10 (citations omitted).

Discussion

¶19 Is the District Court's finding that the condition rendering the mother unfit is unlikely to change within a reasonable time clearly erroneous?

¶20 The District Court's findings address the criteria for termination of parental rights set forth at § 41-3-609, MCA. In the present case, those criteria are that the children had been adjudicated youths in need of care; an appropriate treatment plan that had been approved by the court had not been successful; and the conduct or condition of the mother rendering her unfit is unlikely to change within a reasonable time. *See* § 41-3-609(1)(f), MCA.

¶21 The mother does not dispute that S.C., M.J., C.C. and K.C. were adjudicated youths in need of care or that an appropriate treatment plan that had been approved by the court had not been successful. She challenges the District Court's finding that the condition rendering

her unfit to parent is unlikely to change within a reasonable time. She states her intellectual deficits logically will interfere less with her ability to parent as the years go by and the children are better capable of looking out for themselves. She points out that the Department did not intervene in her parenting when the children were younger. She contends the children need stability in the home they have known for years and an environment which, "though imperfect, is bound to become less problematic as the years pass."

¶22 Substantial credible evidence supports the District Court's finding that the mother is simply unable to make sufficient improvement to allow her to safely parent her children. Stivers and Davis both testified to the effect that her parenting ability is greatly impeded by her limited intellectual ability. Unfortunately, intellectual ability is not something that improves in later adulthood. Additionally, the mother's mental and emotional problems did not improve during the treatment plan. Davis testified that the mother is extremely defensive and reluctant to engage in self-help activities, so that she will "toe the line" under ongoing and consistent supervision, but when that supervision is withdrawn she does not seem to have incorporated what she was taught.

¶23 As to the mother's argument that her deficits will interfere less with her parenting as the children grow older, we note that the mother has never had to cope with all four children at once. Logically, more children could cause more stress. Finally, as anyone who has parented a teenager--or, for that matter, anyone who has been a teenager--is aware, the teenage years can easily disprove the idea that raising children becomes simpler as the child grows older.

¶24   Despite the undisputed evidence that the mother loves S.C., M.J., C.C. and K.C.,  the District Court's conclusion that the condition rendering her unfit to parent them are unlikely to change within a reasonable time is correct, based on this record.  We hold, therefore, that the District Court did not err in terminating the mother's parental rights.

¶25   Affirmed.

/S/ KARLA M. GRAY

We concur:

/S/ JAMES C. NELSON
/S/ PATRICIA COTTER
/S/ JIM REGNIER
/S/ JIM RICE