No. 03-255

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 280N

IN THE MATTER OF:

A.R. & M.R.,

    Youths in Need of Care.

APPEAL FROM:    District Court of the Eighteenth Judicial District,
In and for the County of Gallatin, Cause No. DN 2001-12
The Honorable Mike Salvagni, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Alfred F. Avignone, Garrity, Avignone, Banick & Whetstone, Bozeman, Montana (for the Mother)

    For Respondent:

        Mike McGrath, Montana Attorney General, Jim Wheelis, Assistant Attorney General, Helena, Montana; Marty Lambert, Gallatin County Attorney, Bozeman, Montana (for Respondent); Ed Guza, Drysdale, McClane & Guza, Bozeman, Montana (for the Father); Todd Hillier, Schraudner & Hillier, Bozeman, Montana (Guardian ad Litem)

Submitted on Briefs:   August 7, 2003

Decided:  October 7, 2003

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1    Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1996 Internal Operating Rules, the following decision shall not be cited as precedent but shall be filed as a public document with the Clerk of the Supreme Court and shall be reported by case title, Supreme Court cause number and result to the State Reporter Publishing Company and to West Group in the quarterly table of noncitable cases issued by this Court.

¶2    R.L., the natural mother of A.R and M.R., appeals an order of the District Court for the Eighteenth Judicial District, Gallatin County, terminating her parental rights to both children.  We affirm.

¶3    We address the following issue on appeal:  Whether the District Court's finding that the conduct or conditions rendering R.L. unfit are unlikely to change within a reasonable time is clearly erroneous.

### Factual and Procedural Background

¶4    On June 6, 2001, the Department of Public Health and Human Services (the Department) filed a petition for temporary legal custody of A.R., born April 20, 1998, and M.R., born May 5, 1999.  In the petition, the Department alleged that it had received reports of frequent altercations in front of the children between R.L. and G.R., the children's natural father, and that during one of these altercations, A.R. suffered a minor injury to her back. The Department also alleged that it had received reports that R.L. and G.R. smoked marijuana in the presence of the children, but the Department was unable to substantiate

those reports.

¶5     Both R.L. and G.R. met with a Department social worker and agreed to sign and participate in a voluntary treatment plan. However, the Department alleged that R.L. failed to abide by the terms of her treatment plan. Among other things, the Department maintained that R.L. would drop her children off at their paternal grandparents and fail to return to pick them up. In addition, a social worker for the Department became alarmed about the family's housing arrangements because R.L. and G.R. failed to provide consistent housing for the children. G.R. eventually signed a voluntary agreement placing the children in foster care.

¶6     On June 7, 2001, at a hearing on the Department's petition for temporary legal custody, R.L. and G.R. stipulated that they had engaged in conduct that inflicted psychological abuse on the children. Thus, the District Court adjudicated A.R. and M.R. as youths in need of care. On June 13, 2001, the court granted the Department temporary legal custody of the children and approved treatment plans for both R.L. and G.R.

¶7     On December 12, 2001, the Department petitioned the District Court for a six-month extension of temporary legal custody to provide the parents additional time to complete their treatment plans. The court granted the Department's request and extended temporary legal custody to June 13, 2002.

¶8     G.R. successfully completed his treatment plan and the Department's temporary legal custody of the children was dismissed as to him. R.L., however, failed to complete her treatment plan. Consequently, on June 12, 2002, the Department petitioned the District Court for an order terminating R.L.'s parental rights. A hearing was held on the petition on

3

December 2, 2002, at which time the court heard testimony from R.L., R.L.'s sister-in-law and representatives of various agencies working with the Department.

¶9 On January 6, 2003, the District Court determined that R.L. failed to complete the treatment plan and that the conduct or conditions rendering her unfit were unlikely to change within a reasonable time. Consequently, the court ordered the termination of R.L.'s parental rights. R.L. appeals the District Court's order.

## Standard of Review

¶10 A district court's decision to terminate parental rights is discretionary and we review that decision to determine whether the court abused its discretion. *In re A.T.*, 2003 MT 154, ¶ 9, 316 Mont. 255, ¶ 9, 70 P.3d 1247, ¶ 9 (citations omitted). The test for an abuse of discretion is "whether the trial court acted arbitrarily, without employment of conscientious judgment, or exceeded the bounds of reason resulting in substantial injustice." *In re D.V.*, 2003 MT 160, ¶ 14, 316 Mont. 282, ¶ 14, 70 P.3d 1253, ¶ 14 (quoting *In re K.C.H.,* 2003 MT 125, ¶ 11, 316 Mont. 13, ¶ 11, 68 P.3d 788, ¶ 11).

¶11 Because a parent's right to the care and custody of a child is a fundamental liberty interest, it must be protected by fundamentally fair procedures. *D.V.*, ¶ 14 (citations omitted). Therefore, to satisfy the relevant statutory requirements for terminating a parent-child relationship, a district court must make specific factual findings. We review the district court's findings of fact to determine whether they are clearly erroneous and we review the court's conclusions of law to determine whether the court interpreted the law correctly. *D.V.*, ¶ 14. A finding of fact is clearly erroneous if it is not supported by substantial evidence; if

4

the district court misapprehended the effect of the evidence; or if, after reviewing the record, this Court is left with a definite and firm conviction that the district court made a mistake. *A.T.*, ¶ 9 (citations omitted).

¶12     Moreover, the burden is on the party seeking termination to demonstrate by clear and convincing evidence that every statutorily-required finding for termination has been satisfied. *In re S.C.,* 2003 MT 93, ¶ 18, 315 Mont. 188, ¶ 18, 68 P.3d 685, ¶ 18. In the context of parental rights termination cases, we have defined clear and convincing evidence as simply a requirement that a preponderance of the evidence is definite, clear, and convincing, or that a particular issue must be clearly established by a preponderance of the evidence or by a clear preponderance of the proof. *In re S.M.*, 2001 MT 11, ¶ 30, 304 Mont. 102, ¶ 30, 19 P.3d 213, ¶ 30 (citations omitted).

## Discussion

¶13     *Whether the District Court's finding that the conduct or conditions rendering R.L. unfit are unlikely to change within a reasonable time is clearly erroneous.*

¶14     To terminate a parent-child relationship, a district court must determine that one of the criteria in § 41-3-609, MCA, exists. *D.V.*, ¶ 16 (citations omitted). Relevant to this case, § 41-3-609, MCA (2001), provides:

> (1) The court may order a termination of the parent-child legal relationship upon a finding that any of the following circumstances exist:
> . . . .
> (f)  the child is an adjudicated youth in need of care and both of the following exist:
> (i)  an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and
> (ii)  the conduct or condition of the parents rendering them unfit is

unlikely to change within a reasonable time.

(2) In determining whether the conduct or condition of the parents is unlikely to change within a reasonable time, the court shall enter a finding that continuation of the parent-child legal relationship will likely result in continued abuse or neglect or that the conduct or the condition of the parents renders the parents unfit, unable, or unwilling to give the child adequate parental care. In making the determinations, the court shall consider but is not limited to the following:

. . . .

(b) a history of violent behavior by the parent;

(c) excessive use of intoxicating liquor or of a narcotic or dangerous drug that affects the parent's ability to care and provide for the child. . . .

¶15 Moreover, as we stated in *D.V.*, "[a] court's decision to terminate a parent's legal rights to a child is not a decision made lightly. Every court forced to make this decision heavily considers what is in the child's best interest." *D.V.*, ¶ 26. This Court has recognized on numerous occasions that in determining whether to terminate parental rights,

[a] district court is bound to give primary consideration to the physical, mental and emotional conditions and needs of the children. Consequently, the best interests of the children are of paramount concern in a parental rights termination proceeding and take precedence over the parental rights.

*D.V.*, ¶ 15 (citing § 41-3-609(3), MCA).

¶16 R.L. argues that the Department failed to present sufficient evidence that the conduct or conditions rendering her unfit are unlikely to change within a reasonable time. She contends that in a February 2002 meeting with Katie Warne, a Department social worker, Warne effectively prevented R.L. from completing work on her treatment plan when Warne told R.L. that it was all over even though R.L. still had about four months left to complete the plan. R.L. maintains that if the Department had given her encouragement and a sufficient opportunity to work the treatment plan, she may have been able to complete it by

6

the June 2002 deadline. In fact, she says that she made significant progress in completing the requirements of the plan on her own by the time of the December 2002 hearing.

¶17   Determining whether the conduct or conditions rendering a parent unfit are unlikely to change within a reasonable time requires an assessment of the parent's past as well as present conduct. *In re L.S.,* 2003 MT 12, ¶ 10, 314 Mont. 42, ¶ 10, 63 P.3d 497, ¶ 10 (citations omitted). Warne testified at the December 12, 2002 hearing that R.L. initially complied with the terms of her court-ordered treatment plan by completing parenting classes, a chemical dependency evaluation and a psychological evaluation. Warne also testified that R.L. does not have a mental illness and that R.L. has never physically abused her children. Nevertheless, Warne testified that R.L. "dropped out" of the treatment plan in September 2001, and that R.L. failed to maintain contact with the Department; failed to attend counseling; failed to attend supervised visitation with the children; and did not submit to drug and alcohol testing.

¶18   As further evidence of R.L.'s noncompliance, Warne testified that R.L. did not maintain housing and that she was not consistently employed. R.L. had provided the Department with an address, but social workers were never able to find her there. Warne stated that her inability to locate R.L. prevented Warne from performing her required unannounced home visits and from placing family-based services in R.L.'s home. In addition, Warne testified that one of the children is asthmatic and R.L. did not comply with the requirement to cease smoking.

¶19   In December 2001, the Department requested an extension of temporary legal custody

7

to help R.L. comply with her treatment plan. However, R.L. again failed to attend counseling; to meet with the Department; to attend supervised visitation with the children; and to submit to drug and alcohol testing. It is a long-standing principle that complete compliance with a treatment plan is required, as opposed to partial compliance or even substantial compliance. *D.V.*, ¶ 27 (citations omitted).

¶20 R.L. testified that she did not continue working on her treatment plan because, at a February 2002 meeting, Warne gave her the impression that she had already failed her treatment plan and that she could no longer work on it. R.L. claims that Warne told her at that time that she should either relinquish her parental rights or the Department would seek termination. R.L.'s sister-in-law, who was also at the February 2002 meeting, testified in support of R.L.'s version of the meeting.

¶21 Warne testified, on the other hand, that she did attempt at that meeting to get R.L. back into the treatment plan.

> Q. Did you at this meeting ever tell [R.L. or her sister-in-law] she could no longer work the treatment plan?
> A. I don't recall that I did; however, at that time because she had failed it so badly, I might have given that idea to them. I'm not sure but I don't recall telling them she could no longer work the treatment plan. We did try to get her back on board but [she] didn't stay for the whole meeting. She and [her boyfriend] was there present at that meeting but they left probably one hour into it.
> Q. Okay. So you did have conversations about trying to get her back onto the treatment program at the time?
> A. Yes, we did.

¶22 While the evidence on what occurred at this meeting is conflicting, even if R.L. did leave the meeting with the impression that she could no longer work her treatment plan, R.L.

contacted Warne on May 2, 2002, and Warne informed R.L. that she could continue to work on the treatment plan. To that end, Warne scheduled a meeting with R.L. for the following Monday, but R.L. never showed up for the meeting, nor did she attempt to reschedule.

¶23 R.L. did not contact the Department again until September 2002. At that time, she requested an opportunity to resume work on her treatment plan. R.L. testified that although she did not speak with Warne, she was told that she could not resume work on the treatment plan. Warne testified that she did not believe that R.L. should resume the plan at that time because of the length of time the plan had been in effect without R.L.'s compliance and because of the lapse of time since Warne's last meeting with R.L.

¶24 R.L. initially testified that three or four months into the court-ordered treatment plan, she developed a drug problem due to the loss of her children. However, under questioning by the court, R.L. admitted that she had used drugs before her children were removed from her care. She testified, however, that she had been drug free for about six months and that she now has a properly furnished home, a stable full-time job and that she would like to resume her role as a responsible mother to her children.

¶25 R.L conceded that she had not complied with the treatment plan in full, but she said that she had changed, that she was "clean and sober" and that she deserved another chance. She agreed however, that she had not produced proof of her sobriety nor had she attended any Alcoholic's Anonymous or drug treatment meetings as required by her treatment plan.

¶26 "Regrettably, we do not have a crystal ball to look into to make [the determination that the conduct or conditions rendering a parent unfit are unlikely to change within a

9

reasonable time], so it must, to some extent, be based on a person's past conduct." *In re S.M.,* ¶ 41 (quoting *In re C.A.R.* (1984), 214 Mont. 174, 187, 693, P.2d 1214, 1221).

¶27 Eric Bryson, the operations vice-president for Mountain Peaks, testified that for six months, his agency attempted to obtain urine samples from R.L. on over sixty occasions. They obtained only one sample, which tested negative. On all of the other attempts, R.L. either could not be located or refused to provide a sample.

¶28 Joanne Fowler, the co-director of supervised visitation at Hearts and Homes, testified that from July 7, 2001, through January 26, 2002, her organization scheduled thirty-nine visits between R.L. and the children. R.L. canceled six of those visits and did not appear for another seventeen visits. Fowler testified that the children were "visibly upset" when their mother did not arrive for the visits. Fowler's last contact with R.L. was on January 15, 2002, R.L.'s last visit with the children.

¶29 Warne recommended at the hearing that the court terminate R.L.'s parental rights. She testified that she did not believe that R.L.'s behavior would change in the near future because the Department had worked with R.L. for over a year without any success. Warne pointed out that R.L. had not called or visited the children since January 2002.

¶30 In addition, the District Court received the guardian ad litem's report into evidence. In this report, the guardian indicated that she had had no contact with R.L. since the last court hearing in June 2002, and she also recommended that R.L.'s parental rights be terminated.

¶31 In support of R.L., her sister-in-law testified that she believed that R.L. had turned

her life around and that R.L. was serious about being a fit and able parent to the children. In addition, the sister-in-law stated that she was willing to serve as an effective support system for R.L. However, she also testified that contrary to the terms of the treatment plan, R.L. continued to reside with an individual that she had formerly done drugs with and that she believed that R.L. was putting her interest in this individual over the interests of her children.

¶32 Based on the foregoing, we conclude that the District Court's determination that R.L. did not comply with her court-ordered treatment plan is based on clear and convincing evidence and we hold that the District Court's determination that the conduct or conditions rendering R.L. unfit were not likely to change within a reasonable time was not clearly erroneous.

¶33 Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ KARLA M. GRAY
/S/ PATRICIA COTTER
/S/ JIM REGNIER
/S/ W. WILLIAM LEAPHART

11