DA 12-0069

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2012 MT 220

IN THE MATTER OF:

D.B.J.,

     Youth in Need of Care.

APPEAL FROM:    District Court of the Third Judicial District,
In and For the County of Powell, Cause No. DN 10-01
Honorable Ray Dayton, Presiding Judge

COUNSEL OF RECORD:

     For Appellant:

         Kevin E. Vainio, Attorney at Law, Butte, Montana

     For Appellee State of Montana:

         Steve Bullock, Montana Attorney General; Katie F. Schulz, Assistant
Attorney General, Helena, Montana

         Lewis K. Smith, Powell County Attorney, Deer Lodge, Montana

     For Appellee D.B.J.:

         Jeffrey W. Dahood; Knight, Dahood, Everett & Sievers, Anaconda,
Montana

         Submitted on Briefs:  August 1, 2012
         Decided:  October 9, 2012

Filed:

_____
Clerk

Justice Michael E Wheat delivered the Opinion of the Court.

¶1     C.R., D.B.J.'s step-grandfather and guardian, appeals the termination of his guardianship.  We affirm.

¶2     The issues on appeal are as follows:

¶3     1.  Was C.R. afforded a fundamentally fair process and opportunity to participate in the proceedings despite the District Court's initial belief that he had to intervene to become a party?

¶4     2.  Did the District Court comply with the timeline requirements for conducting a show cause hearing within 20 days of the filing of an initial child abuse and neglect petition, as stated by § 41-3-432(1)(a), MCA?

¶5     3.  Did the District Court err by terminating C.R.'s guardianship pursuant to the best interests of the child standard at § 72-5-234, MCA?

## Factual Background

¶6     This case presents a complex factual record.  D.B.J., the son of T.B., the birth mother ("Mother"), and B.J., the birth father ("Father"), was born on April 25, 2003.  In February of 2004, Mother and Father successfully petitioned the Teton County District Court to appoint D.R., the maternal grandmother, and C.R., the step-grandfather, as guardians.  The Teton County District Court's Order Appointing Guardians did not provide any durational limits on the guardianships and did not terminate either Mother or Father's parental rights.  Both Mother and Father were sentenced to prison for drug charges around the time C.R. and D.R. were appointed guardians, and D.B.J. has lived

with his guardians since he was approximately five weeks old. Following their appointment as guardians, neither D.R. nor C.R. has sought to adopt D.B.J.

¶7 On April 23, 2010, the Department of Public Health and Human Services ("DPHHS") removed D.B.J. from D.R. and C.R.'s home and placed him in foster care after it received a report from a school-based social worker that D.B.J. feared C.R. would yell at and hit him. Katherine C. Winter ("Winter"), a Child Protection Specialist with DPHHS, interviewed D.B.J. following the report. D.B.J. told Winter that C.R. yelled at and hit D.R. during fights, and that he feared C.R. would hit and kick him if he got in trouble at school. D.B.J. told Winter that C.R. had previously hit and kicked him. Winter also interviewed D.R., and D.R. confirmed that both she and D.B.J. feared potential physical abuse and that she lived in a possible domestic violence situation. Following D.B.J.'s removal from the home, D.R. separated from C.R.

¶8 On April 29, 2010, the DPHHS filed a petition ("the petition") for Emergency Protective Services, Adjudication as Youth in Need of Care ("YINC"), and Temporary Legal Custody ("TLC"). The District Court issued an Order to Show Cause, Granting Emergency Protective Services and Temporary Legal Custody to the DPHHS, and Notice of Show Cause Hearing on April 30, 2010. The court issued summonses to Mother, Father, D.R., and C.R., noticing the parties of a scheduled May 18, 2010, show cause hearing. Both C.R. and D.R. were personally served with a summons.

¶9 At the May 18, 2010, show cause hearing, the District Court did not allow C.R., D.R., or their respective counsel to either cross-examine or present witnesses. As justification, the court claimed the guardians were not parties to the proceeding. The

3

court did state the guardians would be allowed to make a motion to intervene, but they were "not going to be allowed to cross examine or otherwise appear in the hearing today." This was despite the fact that the petition concerned D.B.J.'s care under the guardianship of C.R. and D.R., and not the parents. When counsel for C.R. was offered the opportunity to make a motion to intervene, he was subsequently cut off by the court.

¶10 Because Father had not been served, the court agreed to consider the petition only as it pertained to Mother at the May 18 hearing. Mother stipulated to the State's request for TLC and Emergency Protective Services. Despite the stipulation, the court allowed the State to call two witnesses, Fredricka O'Farrell ("O'Farrell"), a licensed clinical social worker in D.B.J.'s school, and Winter. O'Farrell and Winter's testimony was presented as an offer of proof following a request by Mother's counsel. Notwithstanding Mother's request, O'Farrell and Winter's testimony largely centered on D.B.J.'s fear of C.R. and possible abuse by C.R. The court also considered a report by the guardian ad litem ("GAL") at the May 18 hearing. The GAL report similarly focused on the conduct of C.R. and D.R. and recommended D.B.J. remain in foster care.

¶11 At the conclusion of the May 18 show cause hearing, the court found D.B.J. to be a YINC, that D.B.J. was "abused and/or neglected or in danger of being abused and/or neglected," and granted DPHHS temporary custody. The court noted that "we're only talking about the mother's rights here." The court did recognize "there's some incongruity to listening to testimony about an individual [C.R.] who's not in the well of the courtroom," but left the matter unresolved. The court subsequently issued an order

4

setting an additional show cause hearing for D.R., C.R., Mother, and Father on June 22, 2010.

¶12 Following a motion by DPHHS, a Permanency Plan hearing was held on June 1, 2010, for the apparent purpose of continuing federal social security foster care funding for D.B.J. DPHHS Child Protection Specialist Gerald Byrd ("Byrd") testified at the hearing. Byrd stated "the plan" was for D.B.J. "to remain in foster care until a more permanent solution" was reached. This hearing did not establish a Permanency Plan with a definite end goal, but both the State and Byrd supported continued foster care until a long-term plan was developed. The court recognized foster care was not a permanent plan, terming it instead a "current situation of necessity." Neither C.R. nor D.R., nor their respective attorneys, participated in the hearing or were afforded the opportunity to cross examine the DPHHS witness.

¶13 The court attempted to remedy its prior exclusion of the guardians at the June 22, 2010, continued show cause hearing. The show cause hearing was preceded by a status conference to resolve C.R. and D.R.'s status in the case. The State argued the guardians had standing to participate as necessary parties to the action. C.R. argued that because he had been served with the petition and summons, he was a necessary party. C.R. also expressed a belief that the court's prior determination of YINC and TLC with regards to Mother would prejudice his case going forward. The court admitted it was unaware C.R. had been summoned as a party to the case, stating "we may have to start over because I denied [C.R.] the opportunity to cross examine anybody, to otherwise participate in the first [May 18, 2010] hearing."

5

¶14 The court ended the June 22, 2010, hearing by stating it would grant the guardians separate show cause hearings. C.R. opposed this offer and again expressed concern that the court had already ordered TLC to DPHHS. In response, the court indicated that "[w]e will consider the matter anew as it relates to the grandparents," and that the State should "be prepared to put your proof on without reliance upon anything that's happened at a previous proceeding in this matter, to give the grandparents the full opportunity to challenge everything." The court apparently considered it "an open question" as to whether D.B.J. would be returned to the guardians and ordered a show cause hearing for the guardians to be set for June 29, 2010.

¶15 After a continuation, the court considered the petition with regards to the guardians on July 6, 2010. Both C.R. and D.R. opposed the petition, presented testimony, and cross examined witnesses. C.R. denied the allegations of abuse. Winter and O'Farrell repeated their testimony concerning D.B.J.'s assertions of fear and physical and verbal abuse. O'Farrell testified that D.B.J. had witnessed domestic violence, had been punched, kicked, and slapped by C.R., and that D.R. had been unable to prevent the abuse.

¶16 At the close of the July 6, 2010, hearing the court adjudicated D.B.J. as a YINC, determined he had either been abused or was in danger of being abused, and granted TLC to DPHHS for six months. The court reached these findings by considering the best interests of D.B.J.

¶17 The court held a hearing on July 13, 2010, to consider DPHHS's permanency plan between D.B.J. and his guardians. Both D.R. and C.R. were present at the hearing. The

6

permanency plan placed D.B.J. in foster care pending development of treatment plans for the guardians, a determination of whether or not termination of the guardians' status was appropriate, or whether or not the parents could be suitable placements for D.B.J. The court approved the plan and found it to be in the best interests of D.B.J.

¶18 Treatment plans were subsequently developed for D.R., C.R., Father, and Mother. C.R. was required to attend anger management counseling, parenting classes, and couples counseling, and was granted weekly visits with D.B.J. C.R. completed the anger counseling. C.R. was also required to undergo a complete physical and psychological evaluation.

¶19 Sometime in October, 2010, C.R. suffered what was termed a psychotic episode and was briefly hospitalized. D.B.J. witnessed this episode, and C.R. apparently instructed D.B.J. to hit him with a Bible in order to "hit the devil back into the ground." D.B.J. reported being frightened by C.R.'s behavior. C.R. does not have a history of prior mental health issues. A subsequent examination by a clinical psychologist diagnosed C.R. with Depressive Disorder Not Otherwise Specified, as well as a Personality Disorder with Paranoid and Antisocial features. The clinical psychologist determined C.R. had an "extremely poor" prognosis as a caregiver to any child and was a "poor candidate" for treatment through individual therapy. DPHHS terminated C.R.'s visits with D.B.J. following the episode.

¶20 On April 21, 2011, DPHHS filed a Petition for Extension of Temporary Legal Custody for six months to allow Mother and Father to complete their treatment plans, and

a Petition to Terminate Guardianship seeking to remove C.R. and D.R. as D.B.J.'s guardians. A hearing was held on both petitions on June 28, 2011.

¶21 At the June 28, 2011, hearing, all parties stipulated to the extension of TLC. Consideration of the petition for termination of D.R.'s guardianship was continued, and the court proceeded solely with regards to C.R. The State called Dr. Susan Dey ("Dr. Dey"), a licensed clinical psychologist, to testify. Dr. Dey conducted the psychological evaluation of C.R. following his psychotic episode. Dr. Dey testified that C.R.'s episode put D.B.J. in danger and recommended C.R. be allowed only supervised contact with D.B.J. In Dr. Dey's opinion, C.R. should never have unsupervised contact with D.B.J. The GAL, Claudia Johnson ("Johnson"), similarly testified that she did not believe C.R.'s guardianship was in D.B.J.'s best interest. Winter also testified for the State. Winter again testified as to D.B.J.'s fear of C.R., stating that DPHHS had determined that neither visitations, nor a continuation of the guardianship, would be in D.B.J.'s best interest. C.R. testified on his behalf, stating his deep affection for D.B.J. and asserting his psychotic episode was precipitated by an adverse reaction to prescribed antidepressant medication. C.R. claimed DPHHS had failed to comply with its visitation obligations and that he had complied with his own Treatment Plan obligations.

¶22 The court entered an Order terminating C.R.'s guardianship of D.B.J. on September 13, 2011, applying the best interests of the child standard pursuant to § 72-5-234, MCA. The court based the order on the evidence of C.R.'s psychotic episode, Dr. Dey's prognosis that C.R. would remain an extremely poor caregiver to a child, the GAL's testimony on the efficacy of the foster care situation, C.R.'s past history of

emotional and physical abuse, and C.R.'s lack of an individual ability to provide for D.B.J.'s needs. The Order also extended the State's TLC of D.B.J. for six months from June 28, 2011.

## Standards of Review

¶23 We review a district court's conclusions of law for correctness. *In re Adoption of S.R.T.*, 2011 MT 219, ¶ 11, 362 Mont. 39, 260 P.3d 177 (citing *Kulstad v. Maniaci*, 2009 MT 403, ¶ 6, 353 Mont. 467, 221 P.3d 127). We also determine whether findings of fact are clearly erroneous. *In re L.M.A.T.*, 2002 MT 163, ¶ 15, 310 Mont. 422, 51 P.3d 504. A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the district court misapprehended the effect of the evidence, or if this Court is left with a definite and firm conviction that the district court made a mistake. *L.M.A.T.*, ¶ 15. Last, "whether a person has been denied his or her right to due process is a question of constitutional law, for which our review is plenary." *In re T.S.B.*, 2008 MT 23, ¶ 20, 341 Mont. 204, 177 P.3d 429.

## Discussion

¶24 *Issue 1: Was C.R. afforded a fundamentally fair process and opportunity to participate in the proceedings despite the District Court's initial belief that he had to intervene to become a party?*

¶25 On appeal, C.R. argues that the District Court violated his right to due process by excluding him from the May 18, 2010, initial show cause hearing and June 1, 2010, permanency plan hearing. We conclude, however, that the District Court afforded C.R. a

9

fundamentally fair process and a meaningful opportunity to be heard despite the Court's initial exclusion of C.R. from two pre-termination hearings.

¶26 Initially, C.R. contends that he possesses the same sort of fundamental parental rights to D.B.J. as a natural parent and should have been afforded a commensurate level of due process. In support, C.R. relies on *Pierce v. Society of Sisters of the Holy Names of Jesus and Mary*, 268 U.S. 510, 534-35, 45 S. Ct. 571 (1925). However, C.R. misapprehends the holding in *Pierce*, and the case is distinguishable. *Pierce* concerned the power of the states to compel parents to send their children to public schools. *Pierce*, 268 U.S. at 530-31. The case did not consider the power of the state to terminate either a parent or guardian's relationship with a child. The relative rights of natural parents in termination proceedings were not compared to those of guardians facing removal proceedings. An examination of *Pierce* does not support C.R.'s contention that it broadly accorded guardians the same constitutional protections as natural parents.

¶27 Despite C.R.'s misplaced reliance on *Pierce*, we must examine the nature of C.R.'s interests as a guardian. This is because due process is flexible, and " 'the process that is due in any given case varies according to the factual circumstances of the case and the nature of the interests involved.' " *Sage v. Gamble*, 279 Mont. 459, 465, 929 P.2d 822 (1996) (quoting *Benson v. Scott*, 734 F.2d 1181 (7th Cir. 1984)). Our analysis of the procedures at issue will necessarily depend on the interests at stake. Therefore, we must compare the interests of a guardian in a removal proceeding with those of a parent in a termination proceeding to determine the requirements of due process.

10

¶28 First, natural parents have a long-recognized fundamental liberty interest in the care, custody, and management of their child. *Troxel v. Granville*, 530 U.S. 57, 92-93, 120 S. Ct. 2054 (2000); *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388 (1981); *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S. Ct. 625 (1923); *In re A.S.A.*, 258 Mont. 194, 197, 852 P.2d 127 (1993). We therefore look closely at state action that interferes with fundamental parental rights, and it is well-established that proceedings involving the termination of the parent-child relationship must satisfy strict constitutional due process guarantees. *In re A.S.*, 2004 MT 62, ¶ 12, 320 Mont. 268, 87 P.3d 408.

¶29 Conversely, we have not previously found guardians in removal proceedings to possess rights equal to those of natural parents in termination proceedings. Under Montana law, the legal "parent-child relationship" only encompasses natural or adoptive parents, not guardians. Section 41-3-102(17), MCA. Further, " '[p]arent' means a biological or adoptive parent or stepparent." Section 41-3-102(16), MCA. The Montana Probate Code, Title 72, chapter 5, does define the legal powers and duties of a guardian of a minor. Specifically, Montana law provides:

> a guardian of a minor has the powers and responsibilities of a parent who has not been deprived of custody . . . except that a guardian is not legally obligated to provide from the guardian's own funds for the ward and is not liable to third persons by reasons of the parental relationship for acts of the ward.

Section 72-5-231, MCA. The section goes on to list, "without qualifying the foregoing," specific rights and duties of a guardian. Section 72-5-231, MCA. While Title 72, chapter 5, MCA, does grant guardians rights and responsibilities at least equal, in some respects,

to those of a natural parent, it does not grant guardians similar rights in the case of removal.

¶30    Moreover, Montana law specifically contemplates separate procedures for the removal of a guardian or termination of a parent-child relationship.  This is clear from a comparison of Title 41, chapter 3, MCA, concerning termination of the parent-child relationship, and Title 72, chapter 5, MCA, regarding removal of a guardian.  We have previously found the guardianship provisions of Title 72, chapter 5, MCA, were never intended to act as a substitute for the procedures of Title 41, chapter 3, MCA.  *In re Guardianship of D.T.N.*, 275 Mont. 480, 487-88, 914 P.2d 579 (1996).  The parent-child relationship can only be terminated where a district court makes a finding of abuse, neglect, or dependency in proceedings commenced by a county attorney pursuant to Title 41, chapter 3, MCA.  *D.T.N.*, 275 Mont. at 485, 914 P.2d at 582.  By contrast, "[a]ny person interested in the welfare of a ward" may petition for removal of the guardian "on the ground that removal would be in the best interests of the ward."  Section 72-5-234(1), MCA.  Moreover, evidence that a parent is not fit to care for their children " 'must be clear and convincing to justify depriving a parent of custody of her children.' "  *In re Guardianship and Conservatorship of J.C.*, 2007 MT 106, ¶ 27, 337 Mont. 156, 157 P.3d 1130.  Removal of a guardian under the best interests standard is not subjected to this higher burden of proof.  Section 72-5-234, MCA.

¶31    As Montana law views the removal of a guardian as distinct from the termination of the parent-child relationship, guardians are not afforded equivalent procedural protections.  We therefore hold that guardians' interests in removal proceedings are

distinct from those of parents in termination proceedings. C.R., as a guardian, did not possess due process rights equivalent to those of a natural parent in the removal proceedings at issue.

¶32   Applying the foregoing analysis to the facts of the case, it becomes clear that the court afforded C.R. both notice and a meaningful opportunity to be heard sufficient to satisfy due process. *See In re Marriage of Stevens*, 2011 MT 124, ¶ 18, 360 Mont. 494, 255 P.3d 154 (citing *Mont. Power Co. v. Pub. Serv. Commn.*, 206 Mont. 359, 671 P.2d 604 (1983)). While the court excluded C.R. from two pre-termination hearings, neither permanently affected his status as D.B.J.'s guardian. Even in the case of natural or adoptive parents, "pre-termination hearings entitle the parent to less process than the actual termination proceedings." *In re Declaring A.N.W.*, 2006 MT 42, ¶ 35, 331 Mont. 208, 130 P.3d 619. The May 18, 2010, hearing dealt solely with a pre-termination adjudication of emergency protective services, temporary custody, and YINC. The court limited its findings to Mother and did not consider termination of C.R.'s guardianship or grant the State permanent custody. The court recognized that D.B.J.'s placement with the State after the May 18, 2010, hearing was on "an emergency basis," and that a return to the guardians was a "distinct possibility." The court's findings did not prejudice C.R. moving forward. Rather, the court recognized that the adjudication of the best interests of D.B.J. would require the "substantial involvement" of the guardians. C.R.'s exclusion from the May 18 hearing neither prejudiced his case nor denied him a meaningful opportunity to be heard.

13

¶33 Any lingering due process concerns were remedied by the July 6, 2010, continued show cause hearing. Prior to the hearing, the court stated the matter would be "considered anew" and informed the State that it must "be prepared to put your proof on without reliance upon anything that's happened at a previous proceeding in this matter, to give the grandparents the full opportunity to challenge everything." At the hearing, C.R. called witnesses, gave testimony, and cross examined every DPHHS witness that had testified on May 18, 2010. The court issued its findings adjudicating YINC and granting TLC only after considering this testimony again, with C.R.'s full participation. The court's findings displayed none of the prejudice or negative predisposition that C.R. claims. Instead, the court repeatedly expressed a belief that C.R. and D.R. "should be taking care of" D.B.J. and that D.B.J. ultimately "should be reunified with his guardians." C.R.'s full participation at the July 6, 2010, hearing rectified his earlier exclusion.

¶34 Similarly, C.R.'s exclusion from the June 1, 2010, permanency plan hearing did not violate his right to due process. We have previously found that courts are "not required to provide [a parent] with an opportunity to scrutinize and challenge the evidence and witnesses presented at the permanency plan hearings" held prior to termination hearings. *In re Custody & Parental Rights of M.W.*, 2001 MT 78, ¶ 27, 305 Mont. 80, 23 P.3d 206. The June 1 hearing, however, did not even rise to the substantive level of a permanency plan hearing under § 41-3-445, MCA. The State did not seek to establish a permanent plan, no plan was discussed, and no order approving a plan resulted from the hearing. Instead, the State requested the hearing as a formality to continue federal foster care funding. The hearing, therefore, did not even purport to consider

D.B.J.'s future custody, let alone C.R.'s capabilities or status as a guardian. The court did not issue an order approving a permanency plan until after a July 13, 2010, hearing in which C.R. fully participated. C.R. was therefore afforded a meaningful opportunity to participate in the hearing where a substantive permanency plan was addressed. Recognizing the lower procedural requirements for pre-termination permanency plan hearings and the formalistic nature of the June 1 hearing itself, C.R.'s exclusion from the June 1, 2010, hearing did not violate his right to due process.

¶35    Accordingly, we conclude that the court did not violate C.R.'s right to due process by excluding him from the May 18, 2010, show cause hearing and June 1, 2010, permanency plan hearing.

¶36    *Issue 2: Did the District Court comply with the timeline requirements for conducting a show cause hearing within 20 days of the filing of an initial child abuse and neglect petition, as stated by § 41-3-432(1)(a), MCA?*[1]

¶37    C.R. also claims the District Court lost jurisdiction over the matter by failing to hold an initial show cause hearing within 20 days of the filing of the initial child abuse and neglect petition, contrary to § 41-3-432(1)(a), MCA. Section 41-3-432(1)(a), MCA, provides that

> Except as provided in the federal Indian Child Welfare Act, a show cause hearing must be conducted within 20 days of the filing of an initial child abuse and neglect petition unless otherwise stipulated by the parties pursuant to 41-3-434 or unless an extension of time is granted by the court.

---

[1] For purposes of this section, all citations to the Montana Code Annotated are to the 2009 edition unless otherwise stated. A statute will not be given retroactive effect unless the legislature expressly declares the statute to be retroactive. Section 1-2-109, MCA; *Porter v. Galarneau*, 275 Mont. 174, 185, 911 P.2d 1143, 1150 (1996).

A separate notice to the court stating the statutory time deadline for a hearing must accompany any petition to which the time deadline applies.

Section 41-3-432(1)(a), MCA. The State filed the initial petition in this case on April 29, 2010, and the initial show cause hearing was held on May 18, 2010, nineteen days later. *See* Mont. R. Civ. P. 6(a)(1)(A) (noting when computing time stated in days, exclude the day of the event that triggers the period). The May 18, 2010, show cause hearing met the 20 day time limit.

¶38 C.R. first argues that the May 18, 2010, show cause hearing should be disregarded and that the second show cause hearing on June 22, 2010, provides the relevant date. Alternatively, C.R. contends that the statute's use of "conducted" requires the show cause hearing to be completed within the 20 day time limit. As the June 22, 2010, hearing occurred after the 20 day limit, C.R. argues that the District Court lacked jurisdiction over the Petition, the court's order should be reversed, and D.B.J. should be returned to him. We hold that the District Court complied with the 20 day show cause hearing timeline contained within § 41-3-432, MCA.

¶39 First, C.R. claims that either the District Court "nullified" the May 18, 2010, hearing or the hearing should be considered a "nullity" because of his exclusion. C.R. does not offer legal authority to support either assertion. C.R.'s claim that the court nullified the May 18, 2010, hearing is founded solely upon his reference to the court's statement that later hearings would afford the guardians a "full opportunity to challenge everything." However, C.R.'s citation to the record does not reveal the court either explicitly or implicitly intended the May 18, 2010, hearing to be nullified by any later

16

proceeding. Rather, the court intended to proceed in a "bifurcated" or "tri-furcated" manner, with later hearings addressing different parties. The record shows the court considered the May 18, 2010, hearing to be the "original show cause" hearing. At this hearing, the court agreed to proceed solely with regards to Mother, adjudicating D.B.J. as a YINC and making a dispositional determination of TLC to DPHHS. C.R. offers no other evidence that the court intended to nullify its May 18, 2010, findings as pertained to Mother by later considering the Petition with regards to Father and the guardians. It does not follow that the Court intended to nullify these findings by holding later hearings considering different parties.

¶40 Whether, alternatively, the May 18, 2010, hearing should be considered a nullity because of C.R.'s exclusion may be considered together with C.R.'s claim that the statute's use of "conducted" requires both commencing and completing the show cause hearing within the 20 day timeline. Both assertions require an examination of the language of § 41-3-432, MCA. When construing a statute, "the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted." Section 1-2-101, MCA. Further, when interpreting the language of a statute we first look to the plain meaning of the words it contains. *L.M.A.T.*, ¶ 18 (citing *City of Great Falls v. DPHHS*, 2002 MT 108, ¶ 16, 309 Mont. 467, 47 P.3d 836). When the language is clear and unambiguous, the statute speaks for itself and courts will go no further. *Clarke v. Massey*, 271 Mont. 412, 416, 897 P.2d 1085, 1088 (1995). Determining plain meaning requires that we

17

logically and reasonably interpret language by giving words their usual and ordinary meaning. *Werre v. David*, 275 Mont. 376, 385, 913 P.2d 625, 631 (1996).

¶41    Section 41-3-432, MCA, details the requirements for a show cause hearing. The hearing "must be conducted within 20 days" of the filing of the initial petition unless the parties stipulate otherwise or the court grants an exception. Section 41-3-432(1)(a), MCA. With regards to the substance of the hearing itself, the statute directs that it shall provide an opportunity for the parties with physical or legal custody to provide testimony, that the court shall explain the procedures and rights of the parties and allow the parties with custody to admit or deny the allegations of the petition. Section 41-3-432(3)-(4), MCA. The court must also "make written findings" concerning the removal or return of the child, DPHHS's efforts avoiding removal or promoting return, financial support of the child, and whether another hearing is needed. Section 41-3-432(5)(a)-(e), MCA.

¶42    The District Court's procedures did not run counter to the plain language of the statute. Taken in context, the plain meaning of "conducted" most logically required the court to give notice of and commence a show cause hearing within the 20 day time limit. The plain meaning of "conducted" cannot reasonably be construed to require completion of the show cause hearing within the timeframe. We will not add a requirement that does not logically follow from the plain meaning of the language of the statute. Section 1-2-101, MCA; *Clarke*, 271 Mont. at 416, 897 P.2d at 1088. C.R. offers no authority, legal or otherwise, to support his contrary interpretation of "conducted" as requiring completion. The use of "conducted" in § 41-3-432(1)(a), MCA, requires that a court commence the

18

show cause hearing within 20 days of the filing of the initial child abuse and neglect petition.

¶43    This reading is further supported by the statute's direction that a court may make written findings on "whether another hearing is needed and, if so, the date and time of the next hearing."  Section 41-3-432(5)(e), MCA.  The plain language of the statute allows a court to order further hearings following the initial show cause hearing without placing restrictions on either the substance or timeframe of future hearings.  We have recognized that the plain language of a statute most clearly reveals legislative intent.  *W. Energy Co. v. Dep't of Revenue*, 1999 MT 289, ¶ 11, 297 Mont. 55, 990 P.2d 767.  Here, the plain language of § 41-3-432, MCA, requires that a show cause hearing be commenced within the statute's 20 day timeline but allows the determination of the issues in a show cause hearing to go beyond that time limit and occur in later hearings pursuant to such a finding by the court.

¶44    The District Court held an initial show cause hearing within the 20 day timeline.  The hearing addressed the abuse and neglect petition with regards to Mother and the court adjudicated D.B.J. a YINC and granted TLC to DPHHS.  The court addressed the procedures to be used and discussed the rights of the parties.  Under the statute, the court was free to issue a written finding that another hearing was needed.  Section 41-3-432(5)(e), MCA.  Because the court retained questions regarding service of Father and the status of the guardians, the court did so in its June 4, 2010, Order, setting a continued show cause hearing for June 22, 2010, to resolve those issues.  We find that the District Court complied with the requirements of § 41-3-432, MCA, by holding an initial show

19

cause hearing on May 18, 2010, 19 days after the filing of the April 30, 2010, initial child abuse and neglect petition.

¶45    *Issue 3: Did the District Court err by terminating C.R.'s guardianship pursuant to the best interests of the child standard at § 72-5-234, MCA?*[2]

¶46    Last, C.R. claims the District Court erred by applying the best interests of the child standard under § 72-5-234, MCA. Instead, C.R. claims that the District Court should have applied the statutory guidelines for termination of the parent-child legal relationship found at § 41-3-609(1), MCA. We conclude that the District Court correctly applied the best interests standard pursuant to § 72-5-234, MCA, in removing C.R. as D.B.J.'s guardian.

¶47    As noted, C.R. is not D.B.J.'s parent under Title 41, chapter 3, MCA. For the purposes of § 41-3-609, MCA, " '[p]arent' means a biological or adoptive parent or stepparent." Section 41-3-102(16), MCA. Section 41-3-609, MCA, applies only to the "termination of the parent-child legal relationship." Section 41-3-609(1), MCA. This relationship only includes "a child and the child's birth or adoptive parents, as provided in Title 40, chapter 6, part 2 . . . ." Section 41-3-102(17), MCA. C.R. is a guardian. By its own terms, § 41-3-609, MCA, simply does not apply to guardians. The statute provides that "the court may order termination of the *parent-child legal relationship*," and in no part refers to the removal of guardians. Section 41-3-609(1), MCA (emphasis added).

---

[2] For purposes of this section, all citations to the Montana Code Annotated are to the 2009 edition unless otherwise stated. A statute will not be given retroactive effect unless the legislature expressly declares the statute to be retroactive. Section 1-2-109, MCA.

20

¶48 Contrary to C.R.'s assertions, § 72-5-234, MCA, outlines the procedure for the removal of guardians. Section 72-5-234, MCA, specifically provides that "any person" may petition for removal of a guardian based upon the "best interests" of the child. Section 72-5-234(1), MCA. We have previously held that the statute "expressly requires the court to consider the best interest of the minor child before terminating a guardianship." *In re Guardianship of J.R.G.*, 218 Mont. 336, 340-41, 708 P.2d 263 (1985). The court's conclusion of law applying the best interests standard pursuant to § 72-3-234, MCA, to remove C.R. as a guardian was therefore correct.

¶49 Finally, the court based its determination to remove C.R. as D.B.J.'s guardian upon the testimony of Winter, Dr. Dey, the GAL, C.R., and evidence of C.R.'s psychotic episode. The testimony provided evidence of both mental and physical abuse by C.R., and Dr. Dey expressed an opinion that C.R. had an extremely poor prognosis as a caregiver to any child. The court's findings based on this evidence were not clearly erroneous. We hold the District Court properly removed C.R. as a guardian pursuant to the best interests of the child standard at § 72-5-234, MCA.

¶50 Affirmed.

/S/ MICHAEL E WHEAT

We Concur:

/S/ MIKE McGRATH
/S/ JAMES C. NELSON
/S/ BETH BAKER
/S/ JIM RICE